NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

PROLER INTERNATIONAL
CORPORATION,
Respondent.

No. 79–3158.

United States Court of Appeals,
Fifth Circuit.
Unit A

Jan. 26, 1981.

Elliott Moore, Deputy Associate General Counsel, J. Keith Gorham, Robert G. Sewell, N.L.R.B., Washington, D. C. for petitioner.

Fulbright & Jaworski, A. J. Harper, II, Brian S. Greig, L. G. Clinton, Jr., Houston, Tex., for respondent.

Before WISDOM, AINSWORTH and GEE, Circuit Judges.

WISDOM, Circuit Judge:

Proler International Corporation is a scrap iron salvage company. Its Houston plant employs between 200 and 250 persons. During the first six months of 1978 Proler workers filed a number of complaints with the National Labor Relations Board against the company arising out of a strike and a union organizational campaign. After a two–day trial, an administrative law judge determined that the company had committed a variety of unfair labor practices–including threats, interrogations, and discriminatory discharges–in violation of section 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (3). The Board adopted the ALJ's findings with some minor exceptions and ordered the company to cease and desist from interfering "in any other manner" with the rights of its employees, to reinstate with back pay all discriminatorily discharged employees, and to post appropriate notices at its plant. The Board now seeks enforcement of these orders. We enforce in part, vacate in part, and remand to the Board for further factual findings.

## I.

Around eight in the morning of January 18, 1978, about 20 Proler truckdrivers met in the company conference room to discuss their complaints about working conditions with a company vice–president, Sam Oliver. Oliver stated that he was only a vice–president, not the owner, and that he could not negotiate with the employees at that time. He advised them to return to work or go home, and left the room. The employees went across the street to a roadside diner where they constructed picket signs and discussed the future strategy to be pursued. Within an hour, Oliver went to the diner and talked with the leader of the group, Leroy Stubbs, in an effort to convince the men to return to work. As Oliver left he told Stubbs that unless the men returned to work by 10:30 they would lose their jobs. Oliver and the striking employees continued to communicate with each other for the remainder of the day, and even met once again in Oliver's office. The drivers did not return to work that day and did not unconditionally offer to return to work until January 31, 1978.

The ALJ concluded that Oliver's statement was a discriminatory discharge of the striking truckdrivers that converted what was an economic strike into an unfair labor practice strike. He recommended immediate reinstatement for all the truckdrivers as well as back pay to be computed as of January 31, the date of their unconditional offer to return to work. The Board adopted the findings, but modified the recommended order in one respect. Reversing a thirty–year practice, it ordered that the back pay remedy be computed from the date of the discharge, rather than the date of the offer to return to work.[1] Because we conclude that the Board's finding of a discharge is not supported by substantial evidence and that the strike was not converted into an unfair labor practice strike, we must vacate this part of the Board's order and remand for further findings.

■ The Board and the company hotly dispute whether or not Oliver used the word "fired" in his statement telling the drivers to return to work by 10:30 on the morning of the strike. This dispute focuses on the wrong question. The question is not what specific language was used but whether the language was such that it led the workers reasonably to conclude that they had been fired. *NLRB v. Ridgeway Trucking Co.*, 5 Cir. 1980, 622 F.2d 1222, 1224. There is no evidence in the record that the men considered themselves discharged after the 10:30 deadline passed. The little evidence that exists concerning the drivers' later actions points the other way. Several of them met with Oliver again later in the afternoon. Furthermore, the men sent two mailgrams that afternoon in which they referred to themselves as "employees engaged in concerted activity" and asked for further meetings with management the next day. Similarly, there is no indication that the company considered the men discharged. No final checks were delivered to the men, nor were letters of termination sent. The one statement by Oliver is the sole piece of evidence relied on by the Board. The statement was undoubtedly a threat, which is in itself an 8(a)(1) violation, but it is not enough evidence, when viewed in light of the whole record, to support the Board's conclusion that the threat was actually carried out.

■ The conclusion that the strike was not converted to an unfair labor practice strike follows from the conclusion that no discharge occurred on January 18. It is undisputed that the walkout began in protest of working conditions and was an economic strike. For an economic strike to be converted to an unfair labor practice strike, the employer's unfair labor practice must

---

1. This new remedy was first announced in *Abilities and Goodwill, Inc.*, 241 N.L.R.B. No. 5, 100 L.R.R.M. 1470 (1979), *enforcement denied on other grounds*, 1 Cir. 1979, 612 F.2d 6, and has now been approved by at least one circuit. *NLRB v. Mars Sales & Equipment Co.*, 7 Cir. 1980, 626 F.2d 567, 574. Because we have concluded that no discharge occurred on January 18, we need not address the propriety of this new remedy and of course intimate no view on that issue.

be a contributing factor in causing or prolonging the strike. *NLRB v. Moore Business Forms, Inc.*, 5 Cir. 1978, 574 F.2d 835, 840; *NLRB v. Birmingham Publishing Co.*, 5 Cir. 1959, 262 F.2d 2, 9–10. The employees did not consider themselves discharged. Their continued strike therefore could not have been in protest of their discharge. Similarly, although it is conceivable that they may have been protesting the threat of discharge conveyed by Oliver, there is no evidence to support that notion. No one testified to that effect and apparently none of the picket signs carried by the striking employees listed either the threat of discharge or the supposed discharge as a grievance. There must be evidence of a causal link between the unfair labor practice and the strike. *Cagle's, Inc. v. NLRB*, 5 Cir. 1979, 588 F.2d 943, 950. Since none exists here, the strike remained an economic one.

Discharges may nevertheless have occurred when the strikers unconditionally offered to return to work on January 31. Economic strikers are entitled to immediate reinstatement upon their unconditional offer to return to work, unless the employer can show substantial and legitimate business justifications for refusing to rehire them; employees not rehired at that time are considered discriminatorily discharged. *NLRB v. Fleetwood Trailer Co.*, 1967, 389 U.S. 375, 378, 88 S.Ct. 543, 545, 19 L.Ed.2d 614. Because this case was tried solely on the theory that the strike had been converted to an unfair labor practice strike by the supposed discharge on January 18, neither party offered proof concerning who was not reinstated and whether there were substantial business justifications for the company's failure to reinstate. We therefore remand this case to the Board for further findings on these issues. Those employees found by the Board to have been refused reinstatement without just cause will of course be entitled to the usual reinstatement and back pay remedy.

## II.

In response to a successful union representation election and the union activity that ensued, the company undertook a variety of actions found by the Board to be violations of sections 8(a)(1) and (3) of the Act. With one exception, we affirm the Board's findings.

### A.

On two successive days in February 1978, shortly after the successful union representation election, Earl Ramey, an employee of the company, and his girl friend, Felippa Torres, a former employee, invited several other employees to restaurants away from the plant site. Ramey voiced strong anti-union sentiments and urged the employees to sign a petition asking for another election. Torres served as his translator for the Spanish–speaking employees. The Board found that Ramey and Torres were agents of the company and that their promotion of a decertification petition thus violated the Act.

This Court has held that "[s]ection 8(a)(1) of the Act makes it unlawful for an employer to instigate and promote a decertification proceeding or induce employees to sign any other form of union–repudiating document, particularly where the solicitation is strengthened by the express or implied threats of reprisal or promises of benefit." *NLRB v. Birmingham Publishing Co.*, 5 Cir. 1959, 262 F.2d 2, 7. If the actions of Ramey and Torres can be attributed to the company, they violated the Act. A company can be held accountable for unfair labor practices even if they are committed by persons other than management personnel if the company has taken steps that lead its employees reasonably to conclude that those persons were acting on behalf of management. *Helena Laboratory Corp. v. NLRB*, 5 Cir. 1977, 557 F.2d 1183, 1187. There is substantial evidence to indicate that the company took such steps and that Ramey and Torres were acting on behalf of the company: the company paid for the lunches; the company paid the employees for the time spent; the company provided at least one automobile to transport employees to the restaurants where the luncheons were held; Ramey wore a supervisor's

white hard hat and was thought to be a supervisor by at least one employee; and, after one luncheon, Ramey gathered several of the employees in the personnel office of the company, in the presence of the company's attorney, to obtain their signatures for a revote petition. We affirm the Board's conclusion that the actions of Ramey and Torres violated the Act.

### B.

■ In May and June of 1978, Cesar Navarro, one of the company's personnel officers, was involved in four incidents cited by the Board as unlawful threats and interrogations. The first incident occurred at a plant safety meeting held at a time when strike rumors were in the air. Several employees present at the meeting testified that Navarro told the employees that those who participated in a strike would be fired. Other employees testified that he used the word "replaced". The ALJ credited the testimony of those who said that Navarro used the word "fired" and held that the statement was a threat in violation of § 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1). The company's sole objection to this finding is that the ALJ's credibility choices were unsound. Credibility resolutions are peculiarly within the province of the trial examiner and the National Labor Relations Board and are entitled to affirmance unless inherently unreasonable or self–contradictory. *NLRB v. Standard Forge and Axle Co.*, 5 Cir. 1969, 420 F.2d 508, 510, *reh'g denied*, 427 F.2d 344, *cert. denied*, 400 U.S. 903, 91 S.Ct. 140, 27 L.Ed.2d 140. *See NLRB v. Florida Medical Center*, 5 Cir. 1978, 576 F.2d 666, 671. We can find no such contradictions.

The second incident involving Navarro was a conversation he had with a crane operator named Melchor Ortega. Ortega's unrebutted testimony was that Navarro questioned him generally about the Union's organizational activities and warned him that if any employee induced other employees to join the Union it might endanger their jobs. Such threats of reprisals for union support are prohibited by § 8(a)(1) of the Act. *NLRB v. Gissel Packing Co.*, 1969, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547; *NLRB v. Laredo Coca Cola Bottling Co.*, 5 Cir. 1980, 613 F.2d 1338.

Again, after hearing that employee Howard Predom had filed charges against him with the NLRB, Navarro advised Predom that whether or not the charges were sustained, Predom would lose his job. The Act forbids such coercive actions by employers against employees who file unfair labor practice charges with the Board. *See Nash v. Florida Industrial Commission*, 1967, 389 U.S. 235, 238–39, 88 S.Ct. 362, 366, 19 L.Ed.2d 438, 442; *cf.* 29 U.S.C. § 158(a)(4).

■ Finally, the Board concluded that a conversation between Navarro and employee Ofelia Ortiz was an unlawful interrogation. Navarro approached Ortiz and two other women in their work area in the plant and introduced himself as the new personnel director. As he was leaving he asked the women whether they were going to attend a union meeting scheduled for later in the day. When Ortiz answered that she was unsure, Navarro stated that if she did attend she should not sign any papers because the union would be lying to them.

■ We are unable to agree with the Board that this conversation amounted to an unlawful interrogation. An employer has a constitutional right to express his opinions about a union, and this right is explicitly recognized in § 8(c) of the Act. 29 U.S.C. § 158(c). That section states that an expression of opinion cannot constitute evidence of an unfair labor practice if it contains no threat of reprisal or force or promise of benefit. The statements made by Navarro to Ortiz expressed his opposition to the union, but conveyed no threats. *See NLRB v. Gissel Packing Co.*, 1969, 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547; *Delco–Remy Division, General Motors Corp. v. NLRB*, 5 Cir. 1979, 596 F.2d 1295, 1311. The question concerning whether the women were going to attend the union meeting merely prefaced the later remarks. The question occurred at the end of an otherwise routine conversation, it took place in the employees' work area, it was apparently not aimed at determining whether the

women actually supported the union, and it was not part of a larger campaign of interrogation waged by Navarro to determine which employees were union sympathizers. These factors serve to distinguish this situation from the cases cited by the Board.

Except for the Ortiz incident, the Board's conclusions concerning Navarro's unfair labor practices are affirmed.

### C.

■ Roy Perkins was one of the drivers who participated in the January strike. He was not reinstated until March 22. A week later he was discharged, allegedly for destruction of company property, after he was seen by Herman Proler, executive vice-president of the company, driving a truck with a flat tire. The Board concluded that the company's stated reason for discharging Perkins was a pretext and that Perkins's union activities were the sole reason for his discharge. The usual remedy of reinstatement with back pay was ordered. The company contends that the Board's finding of unlawful motivation is not supported by substantial evidence. More specifically the company argues that there was no evidence that the person who made the discharge decision was aware of Perkins's union activities.

Proof of unlawful motivation can rarely be adduced other than by circumstantial evidence. It is not surprising, then, that the Supreme Court, in a decision handed down shortly after the passage of the National Labor Relations Act, concluded that knowledge and unlawful motivation can be proven solely on the basis of circumstantial evidence. *See NLRB v. Link–Belt Co.*, 1941, 311 U.S. 584, 597, 61 S.Ct. 358, 365, 85 L.Ed. 368. There is enough circumstantial evidence here to support the Board's conclusion. Perkins had participated in the strike and had been returned to work only a week before he was discharged. At the time of the incident, Herman Proler saw Perkins holding a union handbill, so he undoubtedly knew of Perkins's union affiliation. When he was discharged, Perkins was told by the company's chief dispatcher that he had been seen by the "wrong man". Finally, and most importantly, the tire itself was not damaged; the flat was fixed and the tire was put back into service within several days. Perkins's reinstatement with back pay is affirmed.

### III.

■ The company objects to the language of the Board's cease and desist order which bars the company from "in any other manner interfering with, restraining or coercing employees in the exercise of their rights guaranteed under § 7 of the Act". The company did not raise this objection to the order before the Board, however, and the Supreme Court has held that this failure bars the company from raising the issue now absent extraordinary circumstances. *NLRB v. Ochoa Fertilizer Corp.*, 1961, 368 U.S. 318, 322, 82 S.Ct. 344, 347, 7 L.Ed.2d 312; *see* 29 U.S.C. § 160(e). The company has not attempted to show, nor can we find, any extraordinary circumstances.

For the foregoing reasons, we ENFORCE the Board's cease and desist order, the order reinstating Roy Perkins with back pay, and the order to post an appropriate notice as modified to reflect our decision. We VACATE its order of reinstatement with back pay for the workers involved in the January strike and REMAND for further determinations concerning whether discharges occurred on January 31, 1978.