**TEXACO, INC., Petitioner-Cross Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent-Cross Petitioner.**

No. 82–4454.

United States Court of Appeals, Fifth Circuit.

Jan. 19, 1984.

Rehearing and Rehearing En Banc Denied March 7, 1984.

Before GARZA, WILLIAMS and HIG-GINBOTHAM, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge.

Texaco, Inc. petitions for review, and the National Labor Relations Board cross-petitions for enforcement, of an order of the Board, 264 N.L.R.B. No. 151, adopting the findings and conclusions of the Administrative Law Judge that Texaco violated § 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 151 et seq. (1976). The Board found that Texaco violated § 8(a)(1) of the Act by unlawfully encouraging or assisting its employees to withdraw from the International Union of Operating Engineers, Local 340, AFL–CIO ("Union" or "Local 340"). The Board further found that Texaco violated § 8(a)(5) and (1) of the Act by unlawfully terminating its collective bargaining agreement with the Union. We conclude that the record evidence fully supports the Board's findings and therefore grant enforcement of the Board's order.

## I. FACTS

Texaco, Inc. is a Delaware corporation engaged in the refining and marketing of petroleum products and natural gas. This case involves events which occurred at Texaco's refinery in Amarillo, Texas. The production and maintenance employees at the Texaco Amarillo plant had been represented by Local 340 since 1943. In addition to the Texaco bargaining unit, Local 340 represented other bargaining units composed of employees from several other companies in or near Amarillo. Each of the bargaining units represented by the Union had its own Workmen's Committee, consisting of members elected by the employees within that bargaining unit. The Union had delegated to these committees the authority to hold meetings with management representatives and to process employee grievances. Each Workmen's Committee also had the

J.M. Mitchell, David R. Sheil, Houston, Tex., for petitioner-cross respondent.

Elliott Moore, Deputy Associate General Counsel, N.L.R.B., Mark S. McCarty, Washington, D.C., for respondent-cross petitioner.

authority to negotiate its own collective bargaining agreement. Before becoming effective, each contract or modification had to be ratified by the members of the bargaining unit it covered.

In 1979 and 1980 several events occurred which caused members of the Texaco group to become dissatisfied with the Union's representation. For many years all Union members paid the same monthly dues. In 1979, however, the dues schedule was restructured on a prorated basis. As a result of the schedule modification, Texaco employees were required to pay higher dues than Union members at other plants. The dues increase was followed closely by the hiring of a full time business agent by the Union. Many Texaco employees felt that their monthly dues were increased solely to offset the annual salary of this newly hired business agent. The Texaco employees became further dissatisfied with the Union when none of the members of the Texaco bargaining unit were elected as Union officers in the 1980 election. Prior to this election, the Union's leadership had traditionally come from the Texaco group.

On August 7, 1980, Billy Sutton, chairman of the Texaco Workmen's Committee, approached Roger Steers, Texaco's supervisor of employee relations, and informed him of employee dissatisfaction with the Union. Sutton inquired whether Texaco would deal with the Workmen's Committee independently of the Union and asked Steers to obtain a copy of the work practices agreement Texaco had with its non-union employees at its Louisiana refinery. Sutton explained that he wanted this agreement "for our [the employees'] information" and "to determine what Texaco did in a non-union refinery." Sutton also asked Steers how the employees could "get out of" the dues checkoff. Together, Steers and Sutton inspected the collective bargaining agreement. Steers informed Sutton that a checkoff authorization could be revoked on the anniversary date of the authorization or upon the termination of the contract, whichever came first.

The next day Steers telephoned several Texaco officials in Houston and discussed his recent conversation with Sutton. On August 12, he gave Sutton a copy of the Louisiana non-union agreement and had copies distributed to the Company's foremen. Thereafter, copies of the Louisiana agreement were visible and available for employees to inspect, although the ALJ found that the copies were not made from Sutton's copy.

On August 15, Steers held a "brainstorming" conference by telephone with several Texaco officials in Houston. This group concluded that the best way for the employees to revoke the checkoff of their Union dues would be to cancel the entire collective bargaining agreement. One of the Houston officials then dictated over the telephone a memorandum cancelling the bargaining agreement.

After the telephone conversation, Steers went to the firemen's shack where Sutton was working and gave him the memorandum. Although Steers admitted that he might be "sticking [his] neck out" by talking to Sutton, he proceeded to tell Sutton that the best way for the employees to revoke their dues checkoff would be for the Workmen's Committee to cancel the collective bargaining agreement. Steers also told Sutton that they could make a deal only as long as Sutton was the committee chairman or the designated bargaining agent. Steers offered to call in Sutton's replacement from the next shift several hours early so that Sutton and the other committee members could further discuss the matter. Sutton accepted Steers' offer, and while he worked only two hours that day, Sutton was paid a full day's wages.

When the relief man arrived, Sutton met with the other three members of the Workmen's Committee, Billy McBee, Tim Forrest, and Terry Knox. McBee and Forrest were allowed to leave their work stations to attend these meetings. Knox, who had the day off, came into the plant. The committee decided that it should take action to get out of the Union. Sutton telephoned Steers and asked him what procedures were necessary in order to withdraw from the Union. Steers suggested circulating among the employees a petition to revoke the dues check-

off authorization. At Sutton's request, Steers composed and had typed the following petition:

> We, the undersigned, hereby advise TEXACO, Inc., Amarillo Plant, of our desire to withdraw from the Union effective immediately and hereby cancel any checkoff authorization.

The Company's acting plant manager, Don Watts, delivered the typed petition forms to Sutton at approximately noon that same day, along with a copy of the memorandum of agreement terminating the collective bargaining agreement. Sutton and the other members of the Workmen's Committee then circulated the petition throughout the plant and solicited the signatures of the employees during the first and second shifts. The committee members did not tell the employees that by signing the petition they were authorizing the Workmen's Committee to terminate the collective bargaining agreement. Forrest and McBee were permitted to leave their work stations, and Sutton was given the remainder of the day off with pay to solicit signatures. The plant supervisors observed the solicitation activity, but they had been instructed by Steers not to interfere. Employee Aaron Braxton, who worked on the second shift, testified that when he reported to work, he was told to go to the foreman's office. Upon reporting there, he found Sutton, Knox, and Foreman John Remlinger waiting with a copy of the petition. Remlinger then left the room, and Sutton asked Braxton to sign the petition. Braxton, however, refused.

After the solicitation began, the Workmen's Committee met with Company officials twice during the course of this same day, August 15. In both of the meetings, the committee expressed concerns about how the employees would be treated in a non-union plant. Steers responded that he could not answer those questions, and that the employees would have to use their own judgment. In the second of the two meetings, Sutton informed Steers that he had 70 signatures, which constituted a majority of the employees in the bargaining unit. Steers told the committee that the dues payment to the Union would be stopped immediately if the committee signed the memorandum terminating the contract.

Texaco officials and the Workmen's Committee met again the next day, Saturday, August 16. After some hesitation and a caucus by the committee, Sutton and Forrest signed the memorandum of agreement cancelling the collective bargaining contract. The agreement was attached to the minutes of that meeting.[1] Steers, with Sutton's permission, later altered the memorandum of agreement by adding to it "International Union of Operating Engineers (AFL–CIO) Local No. 340" above Sutton's and Forrest's signatures.

---

1. The minutes of the August 16 meeting read as follows:

   > This was a special meeting held at 4:15 P.M. at the request of the Union on the above date to discuss the following:
   > The Union stated that as they had previously indicated to Management the employees are dissatisfied with the International Union of Operating Engineers Local 340. The Committee presented petitions signed by a majority of employees at Amarillo Plant, including the workmen's committee, to withdraw from the Union and cancel check-off authorizations.
   > Both parties subsequently executed the Memorandum of Agreement, a copy of which is attached cancelling the Labor Agreement. The Union emphasized that this action was taken because of their dissatisfaction with the International and Local Union of Operating Engineers.
   > Meeting adjourned at 5:00 P.M.

   The Memorandum of Agreement read as follows:

   > *Memorandum of Agreement*
   > It is hereby agreed by and between Texaco, Inc., Amarillo Plant, and International Union of Operating Engineers (AFL–CIO), Local No. 340, that the Labor Agreement dated February 2, 1979, and effective from January 26, 1979, through January 7, 1981, and which Agreement was extended through midnight January 7, 1982, pursuant to a Memorandum of Agreement dated April 9, 1980, is hereby terminated by mutual agreement of the parties.
   >
   > 16
   > Dated this ~~15~~th day of August, 1980.

   | [INTERNATIONAL UNION OF OPERATING ENGINEERS (AFL–CIO) LOCAL NO. 340] | TEXACO INC., AMARILLO PLANT |
   | --- | --- |
   | /s/ Billy R. Sutton | /s/ E.H. Enloe/DHW |
   | /s/ Tim C. Forrest | |

Copies of the petition and the memorandum were posted in the plant control room on the following Monday morning, August 18. There, several more employees signed the petition. When Sutton informed Steers of the posting of these documents, Steers sent Leonard Reagin, assistant supervisor of employee relations, to the control room to retrieve the documents. Steers also instructed Reagin to take the original petition with him and permit employees to sign it. Reagin was cautioned not to solicit any signatures. On his way to the control room, Reagin stopped at the machine shop and the laboratory. He stayed at each location approximately 30 to 45 minutes answering questions regarding the effect of the signed petition. One employee at each location signed the petition. In addition, two employees signed the petition in the control room. Reagin returned to the main office without removing the copy of either the petition or the memorandum of agreement from the bulletin board. Also during the work day of August 18, employee Louis Tupin came to Steers' office, stated that he wished to sign the petition, and then signed the original lying on Steers' desk.

On Tuesday, August 19, Steers and a Texaco attorney filed a representation petition at the Board's regional office in Fort Worth, Texas. On August 21, Joe Irvin, president of Local 340, filed unfair labor practices charges with the NLRB against Texaco. The Board's general counsel subsequently issued a complaint based upon the allegations set forth in the charges. The processing of the representation petition filed by Texaco was delayed pending resolution of the unfair labor practice charges.

The Board, in agreement with the ALJ, found that the Company had violated § 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), by unlawfully assisting in the circulation of the petition to withdraw from the Union and by unlawfully encouraging its employees to sign this petition. The Board further found, also in agreement with the ALJ, that the Company had violated § 8(a)(5) and (1) of the Act, 29 U.S.C. § 158(a)(5) and (1), by unlawfully terminating its collective bargaining agreement with the Union because the memorandum cancelling the agreement was based upon the tainted anti-union petition and was not ratified by the Company's bargaining unit employees.

The Board's order required the Company to cease and desist from the unfair labor practices found; to recognize and bargain with the Union as the bargaining representative of its production and maintenance employees; to honor its bargaining agreement and any renewal agreements; to reimburse the Union for all membership dues which it had failed to withhold on and after August 16, 1980; to continue such reimbursement until August 16, 1983, or until the valid termination of the collective-bargaining agreement; and to post appropriate notices.

## II. SECTION 8(a)(1) VIOLATIONS

Section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) (1976), makes it an unfair labor practice for an employer to "interfere with, restrain, or coerce" employees in the exercise of their right of, *inter alia,* self-organization under § 7 of the Act, 29 U.S.C. § 157 (1976). It is clear that the ALJ found no evidence that Texaco coerced the employees into signing the anti-union petition. Thus, the central issue we must decide is what degree of non-coercive employer interference is violative of § 8(a)(1). The Board based its findings of unlawful interference on the following facts:

(1) Although Sutton expressed, on behalf of the Union employees, some interest in revoking the dues checkoff authorization, the Company expanded this interest by initiating the idea of cancelling the collective bargaining agreement.

(2) After the Company officials decided in a private "brainstorming" conference that the employees should withdraw from the Union, one Company official composed, without request from the employees, a memorandum of agreement cancelling the collective bargaining agreement. The Company then induced the Workmen's Committee to call an emergency meeting on Company time to discuss withdrawing from the Union.

(3) The Company encouraged and assisted in the circulation of the anti-union

petition by preparing the petition and permitting the committee members to circulate it and solicit signatures during working hours without interference from Company supervisors.

■ We examine each of these findings to determine whether they reach the level of interference violative of § 8(a)(1). In doing so, we note that we must accept the Board's findings if they are supported by substantial evidence in the record as a whole. *Universal Camera Corporation v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464–465, 95 L.Ed. 456 (1951); *TRW, Inc. v. NLRB,* 654 F.2d 307, 310 (5th Cir.1981).

■ In *Southern Conference of Teamsters v. Red Ball Motor Freight, Inc.,* 374 F.2d 932, 938 (5th Cir.1967), we held that "[i]f the employer commits an *act* which demonstrates in any way a preference for one union over the other, it has interfered with the fundamental right of its employees to choose their own representative." (Emphasis added.) Although *Southern Conference* involved a competing union situation rather than a union versus non-union situation, the mandate remains the same—the employer must maintain complete neutrality of action, as contrasted with expression of views, in regard to its employees' decision to become or remain unionized. Thus, an employer may not act by way of preference, but may *voice* preference for a particular union or its preference that the employees remain non-union. The right of expressing preference, of course, is protected by the First Amendment and § 8(c) of the Act, 29 U.S.C. § 158(c) (1976).[2] *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969); *TRW-United Greenfield Division v. NLRB,* 637 F.2d 410, 419 (5th Cir.1981); *TRW, Inc. v. NLRB, supra,* 654 F.2d at 313. Further, it is clear that an employer may furnish information upon request to employees when they independently have decided to exercise a statutory or contractual right to revoke a dues checkoff authorization or re-

sign from the union. *See, e.g., Landmark International Trucks, Inc. v. NLRB,* 699 F.2d 815, 820 (6th Cir.1983); *NLRB v. Monroe Tube Co.,* 545 F.2d 1320, 1327 (2d Cir. 1976). It is equally clear on this record that Texaco did more than merely voice its opposition to the Union or provide requested information.

■ Sutton approached Steers on August 7 with three specific inquiries: (1) whether the Company would deal with the Workmen's Committee independently of the Union; (2) whether Steers could obtain for him a copy of the Louisiana non-union agreement; and (3) what action was necessary for the employees to revoke the dues checkoff authorization. Sutton made clear to Steers that he wanted this information because the employees "... didn't really know what [they] were looking for [and] ... wanted to check out the options." Steers provided the requested information but did not stop there. He not only provided Sutton with a copy of the Louisiana agreement, but also distributed copies to Company foremen, and without request from Sutton, made copies available to the employees for inspection. In addition, Steers and other Company officials held a private brainstorming conference where they initiated the idea that the employees should withdraw from the Union. To introduce and implement this idea, again without request from the employees, the Company fully prepared a memorandum of agreement cancelling the collective bargaining agreement.

A neutral approach would have required the Company to provide the requested information and stop at that point. This would have given the employees time to discuss the options among themselves and make up their own minds as to whether they wished to withdraw from the Union. There is no indication that the employees had the idea or the intention to withdraw from the Union prior to August 15, when

---

**2.** Section 8(c) of the Act provides as follows:
(c) The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

Steers presented the idea to Sutton. The evidence shows that the employees' initial concern was to revoke the dues checkoff authorization, not withdraw from the Union. Of critical importance in this case is the fact that most of the employees did not realize that by signing the anti-union petition they were asking for cancellation of the collective bargaining agreement which established all their working conditions. Withdrawal from the Union is a far less significant act than cancelling all agreed working conditions at once. Yet, the committee members, as set out above, failed to mention this potentially drastic result when soliciting signatures. If the Company had not interfered, the dissatisfied employees might have been able to reach a compromise with the Union officials. Indeed, the record shows that in October of 1980, the Union terminated the business agent, whose hiring caused part of the employees' dissatisfaction with the Union. However, by this time the Company had already induced the employees to take the action of withdrawing from the Union.

The Company's lack of neutrality was shown in stark form by its suspension of plant work rules in order to provide an opportunity for Workmen's Committee members to solicit employees while on duty to sign the petition calling for the Company initiated idea to withdraw from the Union. Sutton was given virtually the entire day off to discuss the matter with the other committee members and to circulate the petition. Bill McBee and Tim Forrest, two other members of the Workmen's Committee, were also excused from work with pay to circulate the petition. The Company allowed these employees to solicit petition signatures in spite of the no-solicitation rule contained in Article XIII, H of the collective bargaining agreement. This provision read:

> Solicitation of employees for any employee groups and collection of dues shall not be done during working hours.

This Court has held that an employer violates § 8(a) by enforcing an otherwise valid no-solicitation rule in a discriminatory fashion. *Marathon LeTourneau Company, Longview Division v. NLRB,* 699 F.2d 248,

256 (5th Cir.1983); *NLRB v. Turner Tool & Joint Rebuilders,* 670 F.2d 637, 641 (5th Cir.1982). *See also Revere Camera Company v. NLRB,* 304 F.2d 162, 165 (7th Cir. 1962) ("[w]here an employer discriminates in the enforcement of a no-solicitation rule in favor of anti-union solicitation by employees the employer's act is an unfair labor practice.").

The Company argues, however, that Sutton was given the day off to confer with employees pursuant to Article XIII, E of the contract, which provides:

> Employees acting as representatives of the Union may, with the approval of the Plant Manager, be permitted to confer during working hours with other employees for the purpose of promoting management-employee relationships.

The ALJ properly rejected Texaco's reliance upon this provision as justification for giving Sutton and the other committee members free range to solicit petition signatures. As the ALJ found, this provision applies to the normal incidents involved in administering a collective-bargaining agreement and maintaining the labor-management situation. Such a provision, however, "do[es] not justify Respondent's actions in aiding and abetting the anti-union petition." *Garrett Railroad Car & Equipment, Inc.,* 255 N.L.R.B. 620, 629 n. 16 (1981), *enf'd in relevant part,* 683 F.2d 731 (3d Cir.1982). Moreover, the record shows that prior to this occasion, Sutton had been allowed only "a few moments" to conduct union business during working hours. He was never given virtually an entire work day off with pay to conduct union business except on one occasion when he was excused from working the midnight shift so that he could attend bargaining negotiations the following morning. There was no showing that other members of the Workmen's Committee were given time off from work to solicit employees' actions vis-a-vis the Union.

The Company did not just encourage circulation of the petition by permitting the committee members to solicit signatures freely during working hours. It also assist-

ed in the circulation of the petition by making the petition available for signing in the foreman's office and in Supervisor Steers' office. In addition, the ALJ found that "at least some employees were called to a department office and asked by Sutton if they desired to sign the petition." Employee Marvin McLemore testified without contradiction that when Sutton solicited a group of employees in the clock room on the afternoon of August 15, Maintenance Supervisor Olan Fields was present at the beginning of the discussion. Supervisor Webb also observed Sutton's solicitation at the laboratory. That the employees were aware of the Company's involvement in the anti-union petition is further shown by the fact that employee Louis Tupin came to Supervisor Steers' office looking for the petition and signed it in Steers' presence. By having supervisors present during the solicitation and by permitting the use of Company supervisory offices for soliciting, Texaco gave every appearance that it approved of the petition and that it encouraged employees to sign. Holding such a petition in Company offices for employee signature, while not enough alone to prove actual coercion, nonetheless has coercive tendencies due to the possibility that employees, because of their economic dependence upon the Company, may feel the need to sign the petition in order to curry favor with or avoid disapprobation by Company officials. *See NLRB v. Gissel Packing Co., supra,* 395 U.S. at 617, 89 S.Ct. at 1941–1942; *NLRB v. Brookwood Furniture, Division of U.S. Industries,* 701 F.2d 452, 459 (5th Cir.1983).

Assistant Supervisor Reagin ostensibly was sent to the control room to retrieve a posted copy of the petition. He was instructed, however, to carry a copy of the petition with him in case anyone wanted to sign it and to answer questions regarding the effect of the petition. Instead of removing the petition, Reagin spent as much as forty minutes at several locations in the plant talking with the employees. As a result of Reagin's peregrination, at least four more employees signed the anti-union petition. Reagin's activity clearly gave the appearance that Texaco not only approved of the petition, but also that it in part sponsored its circulation.

This Court has held that "[s]ection 8(a)(1) of the Act makes it unlawful for an employer to instigate and promote a decertification proceeding or induce employees to sign any other form of union repudiating document, particularly where the solicitation is strengthened by the express or implied threats of reprisal or promises of benefit." *NLRB v. Proler International Corporation,* 635 F.2d 351, 354 (5th Cir.1981); *NLRB v. Birmingham Publishing Company,* 262 F.2d 2, 7 (5th Cir.1958). In *Proler,* two company representatives invited several employees to restaurants away from the plant site. There, the company representatives expressed strong anti-union sentiments and urged the employees to sign a petition asking for another union election. Although these actions involved no express coercion, this Court found them to be in violation of § 8(a)(1). The evidence in *Proler* showed that the company paid for the employees' lunches and paid the employees for the time they spent attending the lunches. In addition, the company provided at least one automobile to transport employees to the restaurants where the luncheons were held, and after one luncheon, one of the company representatives gathered several of the employees in the personnel office of the company to obtain their signatures for a revote petition. Our decision in *Proler* clearly indicates that it is not necessary for an employer to threaten, coerce, or promise benefits to employees in order for its conduct to violate § 8(a)(1). "Interference" in the terms of the statute is enough.

In *NLRB v. Birmingham, supra,* 262 F.2d at 6–8, an employee requested from company supervisors information on how to transfer to another union. The supervisors first asserted the company's neutrality, then proceeded to help the employee draft a decertification petition. The Board found that the employee "used company time and facilities, and obtained at least indirect support from company officials" in drafting and circulating the petition. *Id.* at 6. We held that the evidence sustained the Board's finding that Birmingham had promoted a movement to

decertify the Union in violation of § 8(a)(1). Although unlike in the instant case, the Birmingham supervisors also made promises of economic benefit to the employees, our holding is instructive nonetheless. The thrust of this Court's ruling in *Birmingham*, as in *Proler*, is that an employers' actions in fostering decertification, furnishing advice, and assisting in the distribution of a decertification petition goes "beyond mere passive observance," even in the face of asserted neutrality. *Id.* at 8.

In sum, a review of this Court's decisions in cases where we are called upon to review Board decisions finding unfair labor practices clearly indicates that we have traditionally held that the type of acts committed by Texaco are proscribed by § 8(a)(1). Thus, we have concluded that an employer violates § 8(a)(1) when it (1) composes and types anti-union documents, *NLRB v. Movie Star, Inc.*, 361 F.2d 346, 348–49 (5th Cir. 1966); *NLRB v. Birmingham Publishing Co., supra*, 262 F.2d at 6–8; (2) permits employees to use its facilities or personnel, *NLRB v. Proler International Co., supra*, 635 F.2d at 354–55; *NLRB v. Movie Star, Inc., supra*, 361 F.2d at 348–49; (3) permits anti-union activities during working time, *NLRB v. Birmingham Publishing Co., supra*, 262 F.2d at 6–8; (4) fails to apply no-solicitation rule to anti-union activity, *Marathon LeTourneau Company, Longview Division v. NLRB, supra*, 699 F.2d at 256; (5) pays employees for anti-union activities, *NLRB v. Proler International Corp., supra*, 635 F.2d at 354; or (6) participates in the circulation of anti-union documents, *NLRB v. Birmingham Publishing Co.*, 262 F.2d at 6–8; *NLRB v. Hill & Hill Truck Line, Inc.*, 266 F.2d 883, 885–86 (5th Cir.1959).

In addition to this Court, other circuit courts as well as the NLRB have long concluded that the type of activity which Texaco engaged in violates § 8(a)(1). It has been held that an employer violates § 8(a)(1) when it engages in conduct "calculated to erode employee support for the Union." *NLRB v. Deutsch Co. Metal Components Division*, 445 F.2d 902, 906 (9th Cir.1971), *cert. denied*, 405 U.S. 988, 92 S.Ct. 1248, 31 L.Ed.2d 454; *accord, NLRB v. Amber Delivery Service, Inc.*, 651 F.2d 57, 67–

68 (1st Cir.1981); *General Motors Acceptance Corp. v. NLRB*, 476 F.2d 850, 855 (1st Cir.1973); *Amalgamated Clothing Workers v. NLRB*, 424 F.2d 818, 824 (D.C.Cir.1970). In *NLRB v. Allen's I.G.A. Foodliner*, 651 F.2d 438, 440 (6th Cir.1981), the Sixth Circuit held, that "[i]t is a violation of § 8(a)(1) of the Act for an employer to sponsor and participate in the circulation of a petition among employees withdrawing support from a union." *See also Dayton Blueprint Company, Inc.*, 193 N.L.R.B. 1100, 1107–08 (1971) (violation of § 8(a)(1) for company to draft and type decertification petition and to pay employee for time spent filing petition); *Shenango Steel Buildings, Inc.*, 231 N.L.R.B. 586, 589 (1977) (violation of § 8(a)(1) for company to assist in the filing of a decertification petition by providing employee with NLRB petition forms, calling lawyer to find out how the form should be prepared, and having company secretary type the petition and mail it to the Board).

We note that in *Landmark International Trucks, Inc. v. NLRB, supra*, 699 F.2d 815 and *NLRB v. Monroe Tube Company, supra*, 545 F.2d 1320 (2d Cir.1976), the Sixth and Second Circuit Courts held that employer conduct somewhat similar in nature to that engaged in by Texaco did not violate § 8(a)(1). The case *sub judice* is clearly distinguishable on its facts from those two cases. In *Landmark International*, the Sixth Circuit held that the evidence failed to support the Board's finding that Landmark had violated § 8(a)(1) by sending letters to employees advising them of their right to resign from the union and to revoke the dues checkoff authorization. 699 F.2d at 820–21. The evidence showed that the employees had requested from company officials information on how to withdraw from the union. The company officials provided the requested information and also provided union withdrawal forms and mailing envelopes. The employees subsequently, without any further assistance from the company, sent in the forms withdrawing their support from the union.

Similarly, in *Monroe Tube*, the Second Circuit held that the evidence failed to support the Board's finding that the employer

had engaged in unfair labor practices by encouraging employees to withdraw their union authorization cards. 545 F.2d at 1327–28. In response to the union's attempt to organize the employees, Monroe Tube held several meetings with its employees during which a company official expressed anti-union sentiments. The company official also advised employees who had already signed authorization cards of their right to demand return of the signed cards and gave them the union's address in the event they wished to request the return of the cards. Although there were allegations of employer solicitation, the court found that the solicitations were made by a non-supervisory employee.

While the limited activities engaged in by Landmark and Monroe Tube may have been insufficient to establish a § 8(a)(1) violation, Texaco's activities went beyond those of Landmark and Monroe Tube. Like Landmark and Monroe Tube, Texaco provided its employees with requested information on union withdrawal. However, unlike those companies, Texaco initiated the idea of cancelling the collective bargaining agreement and persuaded the Workmen's Committee to adopt it, fully prepared the required withdrawal documents, suspended the plant's no-solicitation rule to allow the committee members to solicit signatures for the anti-union petition, provided company offices for employee solicitation, paid the employees for time spent conducting anti-union activities, and participated in the circulation of the anti-union documents.

As the Second Circuit noted in *Monroe Tube,* the propriety of an employer's conduct "must be assessed in light of all the facts in the case." 545 F.2d at 1325. We agree that "the essence of the proscribed conduct [under § 8(a)(1)] is not merely opposition to union activity, but *interference* or coercion which makes impossible the free exercise of employees' rights." *Ibid.* (Emphasis added.) We conclude that the totality of the facts as set out above clearly show

that Texaco's conduct went beyond mere expressed "opposition" to union activity and reached the level of interference with the rights of the employees to exercise freely the choices provided in § 7 of the Act.

## III. SECTION 8(a)(5) VIOLATION

Section 8(a)(5) of the Act makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." The Board adopted the ALJ's findings that Texaco had violated § 8(a)(5) by "unilaterally terminating the collective-bargaining agreement and ceasing the deduction and remittance of union dues." Texaco argues that it validly terminated the collective bargaining agreement pursuant to the memorandum of agreement which expressly indicated the employees' desire and intent to withdraw from the Union. The ALJ found, however, that the memorandum of agreement was invalid because (1) it was based upon the anti-union petition which had been tainted by the Company's unlawful encouragement and assistance, and (2) the members of the Workmen's Committee lacked authority to sign the memorandum of agreement on behalf of Union employees since it had not been ratified by the members of the bargaining unit as required by the Union's constitution and bylaws and in accordance with the parties' past practice.[3]

As we have discussed at length, it is clear that the anti-union petition was unlawfully conceived and circulated. It is also clear that the members of the Workmen's Committee relied upon improperly obtained petition signatures in concluding they had authority to sign the memorandum of agreement on behalf of the employees. The committee members' reliance on the petitions as authority for signing the memorandum of agreement is demonstrated by Sutton's statement to employee McLemore that he (Sutton) was going to circulate the petition until "at least 51 percent of [the employees] sign." Thus, we find substantial evidence

---

**3.** The bylaws of Local 340 require in Article VIII, section 3(c) that a vote to accept or reject any employer proposal or *collective-bargaining agreement* shall be taken at a specially called group meeting (i.e., one called by either the president of Local 340 or the chairman of the group, with a minimum of 48 hours' notice), where the majority of the total votes cast by the members present shall govern.

to support the finding of the Board that the memorandum of agreement was tainted by the anti-union petition which did not disclose the plan to cancel the collective bargaining contract. Texaco, therefore, unlawfully relied upon the illegal petition as a basis for terminating the collective bargaining agreement.

We further find substantial evidence to support the conclusions of the Board that the memorandum of agreement was invalid because it was not ratified by the bargaining unit members. As noted, the Union's constitution and bylaws required a collective bargaining agreement to be rejected or approved by a majority of the total votes cast at a specially called meeting. Ratification was short circuited by the joint activities of the Company and the Workmen's Committee members. Indeed, as mentioned above, many of the employees did not realize when they signed the anti-union petition that the Workmen's Committee would treat the petition as authority to cancel the collective bargaining contract. The signing of the petition, therefore, did not constitute agreement with cancelling the contract.

■ Texaco argues, however, that it was not bound by the Union's internal ratification requirement. We must reject this argument. As the ALJ found, the record contains ample evidence that Texaco was aware of the Workmen's Committee's practice of taking tentative agreements to the Union membership for ratification. Moreover, it is settled that an employer who puts into effect tentatively approved proposals without awaiting the ratification vote by the union membership, unlawfully engages in unilateral action in violation of § 8(a)(5). *See, e.g., Electri-Flex Co. v. NLRB,* 570 F.2d 1327, 1338 (7th Cir.1978); *cert. denied,* 439 U.S. 911, 99 S.Ct. 280, 58 L.Ed.2d 256 (1978).

## IV. CONCLUSION

The Board effectively summarized this case in its holding which we enforce:

> [Texaco] did not maintain a neutral position here, and it obviously went further than simply answering inquiries of employees. After learning from Sutton of employee dissatisfaction, Respondent

initiated and stimulated the activity that led to the employees' withdrawal from the Union and the termination of the contract. Respondent proposed the idea of both the employee petition and the memorandum of agreement to terminate the contract, and also drafted and typed them. In addition Respondent allowed employees to solicit and sign the petition during working time and provided supervisory assistance in making the petition available to potential signers.

> Clearly, Respondent did far more than merely allow employees to exercise the rights guaranteed them in Section 7 of the Act. Respondent actively and effectively participated in the process of furthering employee withdrawal from the Union.

We conclude that substantial evidence supports the Board's findings that the Company violated § 8(a)(1) in interfering with employee rights under § 7 by encouraging and assisting its employees to withdraw from the Union and § 8(a)(5) by unlawfully terminating its collective bargaining agreement with the Union. We grant enforcement of the Board's order.

ORDER ENFORCED.

PATRICK E. HIGGINBOTHAM, Circuit Judge, dissenting:

Were I convinced that the workers at the Texaco Amarillo Plant were in fact deprived in any fashion of their free choice in deciding whether or not to continue their participation in the union, I would not hesitate to join the majority's enforcement of this NLRB order. I respectfully dissent because I am convinced that the contrary is true, and because I think the majority opinion places too much emphasis on facts which are not relevant to our decision in this case and misapplies the case law of this and other circuits.

The majority accepts the Second Circuit's observation in *NLRB v. Monroe Tube Co.,* 545 F.2d 1320, 1325 (2d Cir.1976), that an employer's conduct "must be assessed in the light of all the facts in the case." The majority also recognizes that "the essence

of the proscribed conduct is not merely opposition to union activity, but interference or coercion *which makes impossible the free exercise of employees' rights.*" *Id.* (emphasis added). Though the majority scrupulously recounts every action taken by Texaco in the course of the events here at issue, its factual gathering does not seem to provide a basis for a finding that any of the workers in fact suffered an infringement of the free exercise of their rights. In this pivotal sense this case is distinguishable from most of the cases relied upon by the majority, in which a particular company action, such as lending anti-unionists the use of company facilities or permitting anti-union solicitation during working hours, was one element in a broader range of company activities coercing the workers or interfering with their right to make a free choice. Here, by contrast, the sum and substance of Texaco's activities would have permitted the workers to infer no more than that the company wished them to have an opportunity to consider terminating their membership in the union. As the Sixth Circuit held, however, in *Landmark International Trucks, Inc. v. NLRB,* 699 F.2d 815, 821 (6th Cir.1983), the fact that an employee is able to infer that his employer would be pleased to see him withdraw from the union provides no basis for a finding that the company's activity is coercive.

The majority attempts to distinguish this case from *Landmark* and *Monroe Tube* by asserting that Texaco initiated the idea of cancelling the collective bargaining agreement and persuaded the union workmen's committee to adopt that idea. The record supports no such finding. The majority points out that the company prepared the union withdrawal documents, but does not mention that the company traditionally prepared all of the union related documents for the workmen's committee. The majority insists that Texaco violated the anti-solicitation clause in the union contract. However, a reading of this clause, which provides that there shall be no solicitation of employees "*for* any employee groups," makes clear that this provision was designed to limit union solicitation of new members on company time and is inapposite

to the present facts. If any contract provision is applicable here it is the clause relied upon by the company, which provides that union representatives may confer with other employees during working hours for the purpose of promoting management-employee relationships. Finally, the majority places great emphasis on the fact that some union members signed the anti-union petition while it was being carried by the assistant supervisor of employee relations and while it was in the office of the supervisor of employee relations. What the majority overlooks, however, is that these incidents took place after more than fifty percent of the union members had already signed the petition and the contract between the plant workers and Texaco had already been cancelled. Thus, though I would concede that this conduct would have tainted the entire process had it taken place before the petition had won the support of a majority of the union members, it has no relevance here.

Above all, this case is distinguishable from those cases in which an unfair labor practice has been found, because the employees circulating the anti-union petition were the union representatives from the Amarillo plant. The employees consequently cannot have believed that they were being approached by company agents attempting to induce them to forbear from union activity. Rather, the union members must have believed that their local officers were fulfilling their obligation to represent the best interests of the employees at the plant, that the company was not attempting to undermine the union by granting privileges to anti-union activists that would not be afforded union representatives, and that their own right to choose between supporting and opposing the anti-union drive might be freely exercised. Under these circumstances, I see no justification for overriding the clearly expressed preference of a majority of the workers in the Amarillo plant to withdraw from their union.

For these reasons, I believe that the petition validly authorized the workmen's committee representatives to cancel the collective bargaining agreement between Texaco

**1238**

and the Amarillo plant workers. Any argument that the workers were not aware that the petition would lead to a cancellation of the bargaining agreement is spurious. The workers knew that they were withdrawing from the union and cancelling their dues checkoff authorization, and must therefore have realized that the contract between Texaco and the union would cease to exist. Moreover, employees had as part of their decisional process examined copies of the work rules agreement in effect in Texaco's non-union Louisiana plant, hardly suggesting that the employees did not recognize the consequences of withdrawing from the union. The petition being a valid indicator of the workers' desires, the agreement cancelling the contract is also valid.

We have often shown solicitude for the rights of organized labor. We have been quick to protect workers from having their right to bargain collectively trodden upon by unscrupulous and overbearing employers, and properly so. This case, however, goes beyond solicitude to paternalism. In the absence of any evidence that a single employee felt coerced or felt that his right to make a choice concerning continued membership in the union was in any fashion interfered with or even influenced by the company's actions, the majority determines that the petition drive was tainted and the express desire of the workers to withdraw from the union shall not be honored. In doing so it sustains a finding of an unfair labor practice on less evidence than in any other case I have located. Viewing the facts as they are, and not as they might have been, I would hold that there has been no unfair labor practice here.

The majority opinion's marshalling of the facts makes plain that their relevance is generated by the view that a company which communicates its preference that there be no union interferes with the employees' right of self-organization. I suspect that few union members would be startled to learn that their employer would prefer no union. No labor law command of neutrality requires employer silence, or forbids even a cheer of a choice made freely by the employees. Unable to find interference

here other than that of the Board and now this court, I dissent.