**TEXAS PETROCHEMICALS CORPORATION, Petitioner–Cross Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent–Cross Petitioner.**

**No. 89–4925.**

United States Court of Appeals, Fifth Circuit.

Feb. 11, 1991.

---

**400**

Samuel E. Hooper, Houston, Tex., for petitioner-cross respondent.

Julie Broido, Aileen Armstrong, Deputy Assoc. Gen. Counsel, N.L.R.B., Washington, D.C., for respondent-cross petitioner.

Louis V. Baldovin, Jr., Director, N.L.R.B., Houston, Tex., other interested party.

Before CLARK, Chief Judge, and GARZA and DAVIS Circuit Judges.

GARZA, Circuit Judge:

The National Labor Relations Board found Texas Petrochemicals Corporation violated §§ 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 151 et al. Texas Petrochemicals petitioned this court to review the NLRB's decision and order, and the NLRB cross-applied for enforcement of the order.

### I. The Facts

Texas Petrochemicals Corporation (TPC) bought an existing chemical plant from Petro–Tex Chemical Corporation located in Houston in June 1984.[1] The Oil, Chemical and Atomic Workers International Union, Local 4–227, AFL–CIO (Union) represented some of Petro–Tex's employees for almost 30 years. When TPC took over, there were 103 unit employees, all but a few were former Petro–Tex employees.

Shortly after the purchase, the Union notified TPC by letter claiming it represented a majority of unit employees and demanding negotiations start. At a July 19 meeting, TPC acknowledged that as a successor employer, it was obligated to recognize and bargain with the Union. After some preliminary negotiations, TPC told the Union it would need two weeks to prepare a contract proposal and would contact the Union about future meetings. The following day, TPC posted a notice informing the employees that it had recognized the Union.

On July 18, the day before meeting with the Union, TPC President Shelton met with supervisors who felt the employees no longer wanted union representation. Shelton asked the supervisors to make a record of this discontent because TPC had to recognize the Union unless there were objective criteria indicating the Union's loss of support.[2] TPC collected 24 comments reportedly made voluntarily by unit employees to supervisors. These comments

---

**1.** All dates given occurred in 1984 unless otherwise stated.

**2.** Shelton testified that his labor counsel advised him of this.

ranged from clear statements against union representation, to mere observations concerning the Union's lack of presence at the plant. On the morning of July 26, not knowing if sufficient objective evidence existed to withdraw recognition from the Union, TPC decided to poll its employees that day and the next.[3] Before their shift began, employees were told there would be a meeting of some importance but attendance was not mandatory. TPC did not notify the Union it was polling the employees, though after the first day one employee left a message on the Union's answering machine. After Shelton gave a speech to the first shift of voting employees, a petition was presented to him with 35 signatures stating that the Union was no longer wanted and requesting a vote be taken. Eight of the signers had earlier made comments to the supervisors.

Of the 103 employees eligible to vote in the poll, 86 actually cast ballots. Of the cast ballots, 50 were against representation by the Union, 35 were for Union representation, and 1 was blank. TPC then withdrew recognition of the Union allegedly based on the results of the poll, the employee petition, and prior expressions of employee dissatisfaction with union representation. TPC then changed the unit employees from hourly to salaried pay and restructured their insurance premiums. The Union subsequently filed a charge with the NLRB that TPC had committed several unfair labor practices in violation of the National Labor Relations Act (NLRA).

An Administrative Law Judge (ALJ) conducted a hearing in October 1984 and issued his decision in February 1985. The ALJ first found TPC had violated section 8(a)(1) of the NLRA by conducting an employee poll *without sufficient evidence*. The ALJ further found TPC had violated section 8(a)(5) of the NLRA by failing to give the Union advance notice of the employee poll, withdrawing recognition from the Union, and unilaterally making the changes described above. The ALJ ordered TPC to cease the unlawful conduct, post an appropriate notice, and bargain with the Union.

TPC filed exceptions to the ALJ's decision in March 1985. Then in April 1985, TPC received an unsolicited report of results of an employee-conducted petition. This petition reflected that a majority of employees did not want union representation. TPC then moved the NLRB to reopen the record to receive evidence of the subsequent employee petition. The General Counsel for the NLRB filed an opposition to TPC's motion to reopen the record in May 1985. The NLRB took no further action in the case until September 1989 when it issued a decision. That decision affirmed the ALJ's findings and conclusions and denied TPC's motion to reopen the record.

In November 1989, TPC moved the NLRB for a stay of its order, reconsideration of the remedy and reopening of the record. The NLRB returned TPC's motion as untimely. In December 1989, TPC petitioned this court to review the NLRB decision and order. NLRB cross-applied for enforcement of the order. In March 1990, TPC moved this court for leave to adduce additional evidence before the NLRB and to remand the case to the NLRB to make additional findings. In May 1990, the NLRB moved this court to strike portions of TPC's brief. These disputed portions relate to TPC's motion to offer additional evidence. Both of these motions have been carried with the case.

## II. The Law

 Unions elected in Board certified elections are vested with a presumption of majority status.[4] This presumption follows

---

3. In this way, four shifts could be polled and almost all the employees would have an opportunity to vote.

4. For one year after certification the union enjoys an irrebuttable presumption of majority status. *Brooks v. NLRB*, 348 U.S. 96, 75 S.Ct.

176, 99 L.Ed. 125 (1954). The presumption is also irrebuttable during a contract period. *NLRB v. Local Union No. 103, Int'l Ass'n of Bridge, Structual and Ornamental Iron Workers*, 434 U.S. 335, 343 n. 8, 98 S.Ct. 651, 656 n. 8, 54 L.Ed.2d 586 (1978).

a union when a new employer acquires an existing business and hires a majority of formerly unionized employees. *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 38, 107 S.Ct. 2225, 2233, 96 L.Ed.2d 22 (1987).

When the presumption is rebuttable, and recognition, therefore, may be withdrawn, an employer must show 1) that he has a reasonably grounded doubt of the union's majority status, or 2) that the union in fact no longer represents a majority. *NLRB v. Curtis Matheson Scientific, Inc.*, — U.S. —, —, 110 S.Ct. 1542, 1544, 108 L.Ed.2d 801, 807 (1990); *NLRB v. Powell Elec. Mfg. Co.*, 906 F.2d 1007, 1014 (5th Cir.1990). Although not favored by the NLRB, an employer may show loss of a union's majority status through an employee poll. The NLRB will allow polling when a "reasonable doubt" exists about the union's status based upon substantial objective evidence. *Boaz Carpet Yarns, Inc.*, 280 NLRB 4 (1986). The NLRB's position about the amount of evidence needed to poll is the same as its position on withdrawal of recognition. *See Thomas Industries, Inc. v. NLRB*, 687 F.2d 863, 867 (6th Cir. 1982). This circuit, however, feels that there is a lesser burden for an employer to justify holding a poll. *NLRB v. A.W. Thompson, Inc.*, 651 F.2d 1141 (5th Cir. 1981). An employer may, in the absence of any employer unfair labor practices and

> after giving notice to the union, poll the employees for their union sentiment if there is *other substantial, objective evidence of a loss of union support* (even if that evidence is not sufficient by itself to justify withdrawal) and if the poll meets the procedural guidelines set out in *Strucksnes* [165 NLRB 1062 (1967)].

*Id.* at 1145.[5] (emphasis added).

This court will therefore consider TPC's decision to poll its employees under

our own standard. However, the NLRB's findings of fact are conclusive if supported by substantial evidence on the record considered in its entirety. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951). Reasonable inferences drawn by the NLRB from its findings of fact may not be displaced even if the court might have reached a different view had the matter been before it *de novo*. *NLRB v. United Insurance Co.*, 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968). In the instant case, applying the facts adopted by the NLRB, we cannot find the NLRB erred in holding TPC improperly conducted a poll of union sentiment.

Our precedent has not articulated an exact definition of "other substantial, objective evidence of loss of union support." Obviously, such substantial, objective evidence must conform to the case law we have developed that allows employee polling, and must not violate the NLRA itself.

At the time TPC conducted its poll, it had before it supervisors' reports indicating 24 employees were dissatisfied with the Union.[6] The NLRB found that several of those statements were not necessarily antiunion. Board Chairman Stephens, concurring in today's case, stated that a poll should not be conducted unless 30 percent of the unit employees indicated their wish to repudiate the union—the standard required to seek a Board decertification election. *Texas Petrochemicals Corporation*, 296 NLRB 136 (1989). The statutory minimum number of petitioning employees needed to force a Board conducted decertification secret ballot [29 U.S.C. § 159(e)(1) ] has not been adopted by this circuit as the minimum number of employees whose expressions of dissatisfaction will establish that degree of substantial, objective evi-

---

**5.** These guidelines for polling are: (1) the purpose of the poll is to determine the truth of a union's claim of majority; (2) this purpose is communicated to the employees; (3) assurances against reprisal are given; (4) the employees are polled by secret ballot; and (5) the employer has not engaged in unfair labor practices or otherwise created a coercive atmosphere. *Strucksnes Constr. Co.*, 165 NLRB 1062 (1967).

TPC is not alleged to have violated any of these guidelines through its poll.

**6.** When the poll was conducted, the employer had the unsolicited petition with 35 names as well as the supervisors' reports. When the company decided to conduct the poll, however, it did not have the unsolicited petition.

dence of a loss of union support necessary to conduct an employee poll. Such a poll can only result in an indication of employee sentiment. It does not *ipso facto* invoke a decertification election. The outcome of such a poll must be considered with all other factors present in the whole industrial setting to determine whether an employer holds a reasonably grounded doubt of the union's majority status. *NLRB v. Curtis Matheson Scientific, Inc.,* — U.S. at —, 110 S.Ct. at 1549, 108 L.Ed.2d at 813. Since we agree that the Board correctly found the poll deficient for lack of notice, it is not necessary to decide whether the present facts met our standard.

### Notice

We find it significant that TPC failed to notify the Union of the poll. *NLRB v. A.W. Thompson, Inc.,* 651 F.2d 1141 (5th Cir.1981), clearly states that polling would be tolerated if there was objective evidence of loss of union support and "after giving notice to the union." *Id.* at 1145.[7] As we previously stated, an employer may turn to avenues other than those sponsored by the Board but there must be some similarity with Board procedure. To allow otherwise would invite abuse. *Strucksnes,* 165 NLRB 1062 (1967), deals with employer polling before a certification election. In those situations, polling would occur when the union is in close contact with the employees and information is being disseminated earnestly. In a post-certification election, a union may not be in as close contact with its members. We do not seek to reward unions who are alien to their members, but are reminded of the consequences of this poll; in a *blitzkrieg* effort an employer could rid itself of a low profile, majority union.[8] Advance notice is particularly important when a successor employer seeks to poll its employees shortly after taking over the company and con-

templates negotiating with the union. *See Fall River,* 482 U.S. at 39, 40, 107 S.Ct. at 2233, 2234 (explaining employees of successor employers may feel their job may depend upon non-union workplace). When the NLRB holds an election, be it certification or decertification, there is a period of time in which both the union and the employer are able to present their side of the issues; advance notice would provide similar benefits when the NLRB is not involved.

TPC claims the Union had notice, but that notice came from an employee who left a message on the Union's answering machine after the first day of polling. This clearly was not an act of an employer giving notice, and in any event, it amounts to being too little too late. TPC also claims the NLRB is introducing a new rule. As the NLRB points out in their brief, they have embraced the advance notice requirement before. *See Hutchinson–Hayes International, Inc.,* 264 NLRB 1300 (1982). Though TPC correctly observes *Hutchinson* is an ALJ's opinion adopted by the Board, it is entitled to full weight since it was validly adopted and more importantly it is the law in this circuit. The NLRB therefore correctly found TPC had committed an unfair labor practice in conducting this poll without advance notice. Because of the above reasoning, the NLRB also correctly found TPC impermissibly withdrew recognition from the Union and unilaterally changed pay and insurance conditions.

### Back To The Bargaining Order Before Us

The NLRB as the nation's labor law specialist is granted special deference by reviewing courts in fashioning appropriate remedies. *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 612, 89 S.Ct. 1918, 1939,

---

**7.** The Ninth Circuit has adopted a similar standard. They also require an employer seeking to poll its employees to give advance notice to the union. *Mingtree Restaurant, Inc. v. NLRB,* 736 F.2d 1295, 1299 (9th Cir.1984).

**8.** Though good faith would still be at issue, an employer could find evidence of loss of support

and hold its poll. If its quickly held poll was successful, an employer could then withdraw recognition. The union may find aid from the NLRB and eventually return. This, however, would probably occur after considerable administrative difficulties, threats to industrial stability and a potential loss of employee trust.

23 L.Ed.2d 547 (1969). The remedial order will be enforced unless it is clear that it does not further the goals embodied in the NLRA. *NLRB v. J.H. Rutter–Rex Mfg. Co.*, 396 U.S. 258, 263, 90 S.Ct. 417, 420, 24 L.Ed.2d 405 (1969). A bargaining order is clearly within the NLRB's power and is a proven weapon against employers who refuse to bargain with the employee's representative. *Franks Bros. Co. v. NLRB*, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1944). However, "[r]eviewing courts are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute. Such review is always properly within the judicial province, and courts would abdicate their responsibility if they did not fully review such administrative decisions." *NLRB v. Brown*, 380 U.S. 278, 291–92, 85 S.Ct. 980, 988–89, 13 L.Ed.2d 839 (1965). This court does not question the NLRB's authority to issue a bargaining order or the propriety to do so; this court is concerned with the NLRB's timing in this case.

While the NLRB is allowed great discretion in adjudicating and formulating appropriate remedies for the cases before it, there are certain substantive limits to that discretion. The NLRB, like myriad other governmental agencies, is subject to the requirements of the Administrative Procedure Act (APA), 5 U.S.C. § 500 *et seq.* One of the seminal requirements of the APA is that an agency endeavor to "conclude a matter presented to it" within a "reasonable time." 5 U.S.C. § 555(b).[9] Without explanation for the delay, the NLRB took over four years after the ALJ had made his initial determination to issue a final order. While administrative delay is common and unfortunately expected, it must be taken into account. If delays are occasioned by an obstinate employer, he may not benefit from his own wrongs, *NLRB v. A.W. Thompson, Inc.*, 449 F.2d 1333, 1337 (5th Cir.1971), and a bargaining order will be enforced. At the same time, a four-year delay by the Board is unreasonable, *see Emhart Indus. v. NLRB*, 907 F.2d 372, 378 (2d Cir.1990), and cannot be ignored in developing a remedy that protects employee rights.[10]

The NLRB claims if its bargaining order is not enforced and it is required to reopen its record, it would be placing a premium on continued litigation. *Seattle–First Nat. Bank v. NLRB*, 892 F.2d 792, 796 (9th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 2618, 110 L.Ed.2d 639 (1990) (stating "[w]hen lack of a union majority ... is the asserted basis for a refusal to bargain, delay becomes the basis of an argument that there ought to be more delay."). With the passage of time, however, any adverse effects caused by an employer's unfair labor practices will be diminished in the eyes of the workforce. When the NLRB unexplainably takes over four years to decide a case before it, it is unclear who is being protected. These two competing factors must be balanced with an eye not only towards the employer and the union but towards the employee.

In *NLRB v. Adhesive Products Corp.*, 281 F.2d 89 (2nd Cir.1960), the employer, Adhesive, had a bargaining relationship with the union, Adco, for several years. Due to some dissatisfaction with the union, the employees looked to several other unions for representation (one of which, District 65 of the Retail, Wholesale & Department Store Union claimed to represent a

---

**9.** This requirement that an agency act within a reasonable time distinguishes the Supreme Court's language in *NLRB v. Katz,* 369 U.S. 736, 747, 82 S.Ct. 1107, 1114 n. 14, 8 L.Ed.2d 230 (1962), in which the Court held that the Congress had not placed time limits on the NLRB's resolution of actions before it. Congress subsequently amended the APA to require agencies to adjudicate cases within a "reasonable time." The amendment deprives this portion of *Katz* of precedential force for our case today.

**10.** We note that by the NLRB's own records, there was an unexplained and inordinate delay in the present case. The latest published figures available (for the fiscal year 1987) show the median time elapsed between the ALJ's decision and the NLRB's decision was 315 days. *See* FIFTY—SECOND ANNUAL REPORT OF THE NATIONAL LABOR RELATIONS BOARD, Table 23 at 250. In this case, the elapsed time for the same interval was more than four years.

majority in 1955 and a bargaining order was subsequently granted in its favor in 1960). The employer tried to maintain a relationship with Adco, but the NLRB ordered Adhesive to withhold recognition from Adco, and one other union and to bargain with District 65. In considering this situation in light of the employees' rights, the court said:

> First they [the employees] should not be made the pawns of any union, the company, or of the Board. Second, they should have an opportunity to express their choice in the manner provided by law.

*Id.* at 91. Due to the great time delay (District 65 alleges to have had a majority of authorization cards several years earlier), the court went on to make the bargaining order "conditional upon the Board's ascertaining by a new election whether the union is the choice of the majority." *Id.* at 92 (citing *NLRB v. National Licorice Co.,* 104 F.2d 655 (2nd Cir.1939) (J. Learned Hand), *modified,* 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799 (1940)).[11]

In *NLRB v. Superior Fireproof Door & Sash Co., Inc.,* 289 F.2d 713 (2nd Cir.1961), the Second Circuit upheld the NLRB's finding that the employer improperly refused to bargain with the union at its Scranton plant. The court, however, found there were inordinate delays[12] in the NLRB proceedings. Since the union "had not given truly effective representation to the Scranton employees in the six months after it was certified [and] it has not represented them for nearly four years, ... it may well not be their choice to represent them now; we propose only that the Board ascertain whether it is." *Id.* at 724. The court therefore made the bargaining order conditional upon a Board authorized election seeking whether the union was still the employees' choice.

In the case at bar, as in *Superior Fireproof,* there was an established union with a presumption of majority status. A Board certified election, like in *Superior Fireproof,* would now be in the best interest of the employees. It has been over six years since the Union represented the employees and provided them with the benefit of any bargaining. On July 26, 1984, on the first day of the poll, a petition clearly adverse to the Union was presented to TPC. It contained 35 signatures out of the 103 employees, more than one third of the unit employees; that well may have been a sufficient showing to justify an employee poll if TPC had given notice to the Union. Though the NLRB did not open the record in 1985 to admit a post-poll unsolicited employee petition in which a majority of the employees stated they were opposed to union representation, we feel this, along with the petition containing 35 signatures, are significant facts which must be considered by this court. In *Peoples Gas System, Inc. v. NLRB,* 629 F.2d 35 (D.C.Cir.1980), the court was faced with a distinct but related situation. In that case, only a minor unfair labor practice was committed. After two years, a Board certified election showed a decisive union loss, and then after another five years, the Board finally issued a bargaining order. The court found on these limited facts the bargaining order was unjustified. Its reasoning is well expressed in footnote 18, 629 F.2d at 45:

> We think it clear that no responsible decision-making body can formulate a reasonable remedy without taking into account conditions at the time its order is entered, though there seems to be some dispute among the circuits whether the Board must do so. The rationale of those cases which conclude that the Board need not consider events which occur after an alleged violation is that if employer misconduct is to be deterred,

---

11. The Supreme Court, in dicta, approved the Second Circuit's decision to make the bargaining order conditional "upon a determination by an election that the Union is still the choice of the majority of the employees." *National Licorice Co. v. NLRB,* 309 U.S. at 359, 60 S.Ct. at 575. In fact, the NLRB did not petition for certiorari nor did it complain about that order.

12. At the time of the *Superior Fireproof* case, there was an average time lapse between filing a charge with the NLRB and final decision of 475 days. *Superior Fireproof* took 1015 days, 471 days intervening between the filing of the charge and the issuing of the complaint. *Superior Fireproof,* 289 F.2d at 723.

the remedy should not reflect later events, but be tailored simply to restore the "status quo" at the time the unfair labor practice occurred. Otherwise, it is argued, a premium is put on continued delay by the employer in the hope of "a new set of facts, as to which the Board must then readjudicate." *NLRB v. L.B. Foster Co.*, 418 F.2d 1 (9th Cir.1969), *cert. denied*, 397 U.S. 990, 90 S.Ct. 1124, 25 L.Ed.2d 398 (1970).

We are unable to approve an approach which mechanically places deterrence above employee free choice on the scale of values under the Act. Taking subsequent events into account does not mean that employer delay must be rewarded. All we require is that the remedy best suited to the purposes of the Act, which include both deterrence of employer misconduct and protection of employee free choice, be selected in light of reality. What is required is an exercise of discretion, with all the careful judgment and balancing of competing considerations implied by the phrase.

Because of TPC's failure to notify the Union, the conduct of the poll and the subsequent acts of TPC based thereon are unfair labor practices. Nevertheless, under all of the facts in this record, including the Board's lengthy delay, were we to enforce this bargaining order without ascertaining the employees' present desires, it would be tantamount to ignoring their statutory rights. Moreover, our decision today effectuates the intent of the NLRA, which was enacted not to further union membership or to deter it but to further employee choice and to provide an effective mechanism for realizing that choice. The most effective means for determining employee sentiment is through a Board sponsored election with its attendant protections. We therefore stay enforcement of the bargaining order until the results of such a decertification election are final and certified. If the employees choose the Union, enforcement shall be granted; if they choose not to vote for the Union, the bargaining order will be denied.

### III. Conclusion

Because of the Board's refusal to consider post-charge evidence, lack of union presence for over six years, the Board's unprovoked and inordinate delay in deciding this case, the unestablished impact of TPC's unfair labor practices, and the equities presented in this record, we will stay the bargaining order and REMAND as MODIFIED subject to an NLRB conducted election. Preparations for this election should begin promptly but in no case later than 90 days after this decision becomes final.