NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

LAVERDIERE'S
ENTERPRISES, Respondent.

Teamsters Union Local 340, Intervenor.

LAVERDIERE'S
ENTERPRISES, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Nos. 90–2035, 90–2129.

United States Court of Appeals,
First Circuit.

Heard March 4, 1991.
Decided May 22, 1991.

Frederick C. Havard, Atty., N.L.R.B., with whom Jerry M. Hunter, Gen. Counsel, D. Randall Frye, Acting Deputy Gen. Counsel, and Aileen A. Armstrong, Deputy Associate Gen. Counsel, N.L.R.B. were on brief, Washington, D.C., for petitioner.

Catherine R. Connors with whom Pierce, Atwood, Scribner, Allen, Smith & Lancaster was on brief, Portland, Me., for respondent/cross-petitioner.

Gabriel O. Dumont, Jr. with whom Law Office of Gabriel Dumont was on brief, Boston, Mass., for intervenor.

Before CAMPBELL, Circuit Judge, COFFIN, Senior Circuit Judge, and CYR, Circuit Judge.

COFFIN, Senior Circuit Judge.

The National Labor Relations Board (NLRB) found that LaVerdiere's Enterprises improperly withdrew recognition from the union that had been representing its warehouse employees for nine years and, among other remedies, ordered that the Company resume bargaining with the union. The Board applied to this court for enforcement of its order, and LaVerdiere's cross-petitioned for review of the order. Although we uphold the Board's determination that LaVerdiere's violated federal labor law, we conclude that the remedy of a bargaining order is inappropriate in this case.

## I. *Factual Background*

Teamsters Union Local 340 ("the Union") was certified to represent LaVerdiere's warehouse employees in 1976, and it subsequently entered into a series of collective-bargaining agreements with the Company, the last of which was scheduled to expire on April 30, 1985. The record indicates that the history of relationships between the Company and the Teamsters was uneventful, with no evidence of Company interference with the Union.

In February 1985, two employees, Francis Richards and Marie Grandmaison, began to circulate a decertification petition. They collected 20 signatures by February 28, which they erroneously believed were enough to meet the necessary 30 percent showing of interest for an election. The unit, however, contained 70 employees—rather than the 59 the employees had thought—and on March 18 the NLRB gave the employees 72 hours to collect additional signatures. Although only one more name was necessary to reach 30 percent, 13 employees signed the petition within the next two days; seven more employees signed by April 5, bringing the total on various petition sheets to 40.

The record indicates that LaVerdiere's played no role in initiating the petition drive. Several incidents occurred during the campaign, however, that involved management. First, on February 28, one of the two petition organizers, Grandmaison, asked the Company's vice president, Michael LaVerdiere, to meet with two employees who had questions about the decertification petition. In his conversation with the two employees, LaVerdiere stated:

> As far as I know, [the petition] is just for a revote. You can sign this petition now, there will be an election in two or three weeks. At that point you can decide to vote for or against the union—change your mind. I'm not trying to sway you. It's totally up to you.

Both employees signed the petition that same day. A similar discussion took place,

apparently also on February 28, with a third employee, Daniel York. When asked whether the Union could have York fired for signing the petition, LaVerdiere said it could not, and that "like I said to everybody else—it was for a revote." York originally had signed the petition but removed his name before speaking with LaVerdiere.

The second incident began on March 11, when five employees completing their 60-day probationary periods asked a LaVerdiere's vice president, Robert Bishop, whether they were required to pay the Union's $50 initiation fee. Although Bishop had told the employees when they were hired in January that, under the union security provision in the collective bargaining agreement, they would be required to join the Union and pay its fees at the end of their probation, he answered at this time that he would check on the requirement. He contacted LaVerdiere's lawyer, who prepared a statement for Bishop to read to the employees as an interim response. Bishop read the following statement on March 13.

> When you were hired I advised you that this Union contract requires you to join and our practice has been to reduce your hours to 30 hours per week.[1] Our legal counsel questions this practice, so until we get clarification, sit tight.

> If you choose not to join the Union by not signing the check-off card and not paying the $50.00 enrollment fee, we will not terminate your employment. We will advise you once we get clarification from our legal counsel. Don't worry about being fired because the Union can't do it and must give you notice about your legal obligations.

One week later, Bishop read another statement prepared by counsel advising the five employees that they were, in fact, required to pay dues and the initiation fee, but were not required to join the Union or make payment by checkoff. The statement also noted that the contract was scheduled to expire on April 30, and that employees need not continue paying dues after that

---

1. The Company reduced the hours of new employees from 40 per week to 30 per week upon completion of the probation period.

date unless the agreement was renewed. Bishop concluded by advising the employees to take no action "until such time that you receive proper notification from the Union office."

Meanwhile, as employee uncertainty about the union was surfacing, the Teamsters and LaVerdiere's were communicating about negotiations for a new contract. On March 7, in response to a Union inquiry, LaVerdiere's proposed deferring the talks until there was some indication of the outcome of the employees' decertification petition. The Union rejected such a delay, and urged a quick start to negotiations. The Company responded on March 13 with a number of possible meeting dates, beginning on April 10.

At this point, however, additional events occurred that reflected anti-union sentiment. On April 3, the Union notified LaVerdiere's that approximately 12 employees had refused to pay initiation fees. On April 9, LaVerdiere's received a letter from attorney David Butler, who represented the employees seeking decertification. Butler stated that Local 340 no longer was supported by a majority of employees, and he therefore requested that the Company refrain from entering bargaining negotiations with the Union. Enclosed with his letter were a typewritten list of 70 names titled "Employees List," another typewritten list of 37 names titled "Anti–Union List," and the petition sheets for which 40 signatures had been solicited earlier. The petitions contained the names of all five probationary employees to whom Bishop had spoken about the initiation fee, as well as the names of the two employees to whom Michael LaVerdiere had stated, upon request by Grandmaison, that the petitions were simply to trigger an election. Butler's "Anti–Union List" contained all of these names with the exception of one of the five probationary employees.

The Company's legal counsel notified the Union about Butler's letter that same day, and on April 10, he sent a letter stating that LaVerdiere's had a "good faith doubt" that a majority of the bargaining unit continued to support the Union. The lawyer, Robert Lewis, further told the Union that he had filed a petition for an election with the NLRB and he proposed that negotiations for a new contract be deferred. The letter stated, however, that the Company would continue to recognize the right of Local 340 to administer the existing bargaining agreement for the remainder of its term.

From this point on, the relationship between the Company and Union was entirely adversarial. No negotiation sessions ever were held. The Teamsters filed a series of unfair labor practice charges against LaVerdiere's, accusing the Company, *inter alia*, of interfering with the union security clause and improperly withdrawing recognition as of April 9, the day Lewis told the Union of the employees' request that the Company refrain from bargaining. On May 10, the Teamsters sent the Company a document, dated May 2, that contained the names of 50 employees who ostensibly supported the union and that called for the firing of attorney Lewis and bargaining with the Teamsters. Lewis drafted a letter in response suggesting that the signatures were coerced. He repeated LaVerdiere's doubts about the union's majority status and the Company's desire for an NLRB-conducted election. Because the filing of unfair labor charges normally blocks any election until the charges are resolved by the Board, however, an election never was held.

On May 27, the NLRB informed Lewis by telephone that it was dismissing the Teamster's charge complaining of unlawful withdrawal of recognition. Lewis immediately called Michael LaVerdiere to tell him that it would be legal to withdraw recognition, and the Company formally did so on that day. The Company subsequently rejected a Union demand for bargaining and refused to allow a Union business representative to enter its facility to investigate grievances, both on the ground that it no longer recognized the Union as its employees' representative.

Nearly ten months later, on March 17, 1986, without explanation, the NLRB's regional director informed the parties that he

was revoking his earlier refusal to issue a complaint on the Union's charge of unlawful withdrawal of recognition. Shortly thereafter, the Board's general counsel issued an order consolidating all pending charges against LaVerdiere's, and a two-day evidentiary hearing took place on June 23 and 24, 1986. The Administrative Law Judge (ALJ), whose opinion issued on October 31, 1986, found that LaVerdiere's had committed four related violations of the National Labor Relations Act (NLRA):

(1) Michael LaVerdiere's statement to three employees that the petitions were just for a "revote" violated § 8(a)(1) of the Act by misleading them concerning the effect of their signatures on the petition. According to the ALJ, the statement was deceptively incomplete because LaVerdiere failed to explain that the signatures also could be used as a basis for a good-faith doubt of continued majority status, thereby allowing the Company to withdraw recognition without an election.

(2) Bishop's statements to the five probationary employees regarding the mandatory initiation fee and related matters violated § 8(a)(1) by interfering with the Union's enforcement of its security clause.

(3) These statements tainted the decertification petitions, precluding reliance on them as a basis for a "good faith doubt" of majority status, making withdrawal of recognition improper under § 8(a)(5).

(4) Finally, because withdrawal of recognition was improper, refusal to permit Union representatives access to Company facilities also violated § 8(a)(5).

The ALJ entered an order requiring that LaVerdiere's cease and desist its violations, post certain notices and, upon request, bargain with the Teamsters. LaVerdiere's appealed. In a brief opinion issued on February 28, 1990—nearly three-and-one-half years after the ALJ's decision—the Board largely adopted the ALJ's findings and conclusions. It found, however, that the "revote statement" did not constitute a violation of § 8(a)(1) because it contained "no threat to interfere with the employees' rights nor promises of benefits and, therefore, is not coercive within the meaning of the Act." Opinion at 3. Because the Board found that LaVerdiere's statements were nevertheless misleading, it upheld the ALJ's determination that the Company could not rely on the petitions as a basis for a good-faith doubt of majority status. LaVerdiere's filed an unsuccessful motion for reconsideration, and both parties then sought review in this court.

The primary issue before us is whether LaVerdiere's should be compelled to bargain with the Teamsters. LaVerdiere's claims that the bargaining order is entirely unsupportable because the Company developed a reasonable good faith doubt that the Union had lost majority status, permitting it to withdraw recognition and thus end its relationship with Local 340. Alternatively, LaVerdiere's contends that, even if we uphold the Board's finding that it lacked a sufficient basis for withdrawing recognition, the circumstances of this case are such that an election, rather than a bargaining order, is the appropriate remedy. In sorting out LaVerdiere's contentions, we shall address three questions: (1) did the Board properly find that Bishop's comments concerning the mandatory initiation fee—the "security statement"—constituted an unfair labor practice, precluding the Company from relying on the petition signatures of the probationary employees; (2) does the evidence, even excluding any "tainted" petition signatures, support a reasonable good faith doubt that the Union had lost majority status, and (3) even if the Board properly found that the Company lacked a good faith doubt, should it have ordered an election rather than impose a bargaining order on the Company.

## II. *Discussion*

### A. Standard of review

▮▮▮▮ The law requires us to review the Board's order with considerable deference. As to matters of fact, the Board's findings must be upheld if supported by substantial evidence on the record as a whole. *See* 29 U.S.C. § 160(e); *NLRB v. Horizon Air Services, Inc.*, 761 F.2d 22, 25 (1st Cir. 1985); *Soule Glass and Glazing Co. v.*

*NLRB*, 652 F.2d 1055, 1073 (1st Cir.1981). We must sustain inferences that the Board draws from the facts and its application of statutory standards to those facts and inferences as long as they are reasonable. *Soule Glass*, 652 F.2d at 1073. We may not substitute our judgment for the Board's when the choice is " 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*,' " *id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951)). And we must defer to the Board's inferences in its areas of specialized experience and expertise. *Id.*

The deference to which the Board is entitled is not, however, unlimited. The courts of appeals are charged with "responsibility for the reasonableness and fairness of Labor Board decisions," *Universal Camera*, 340 U.S. at 490, 71 S.Ct. at 466, and a court must set aside Board action when it " 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light the record in its entirety furnishes, including the body of evidence opposed to the Board's view,' " *id.* at 488, 71 S.Ct. at 465, *quoted in Soule Glass*, 652 F.2d at 1073.

With these principles in mind, we turn to our review of the Board's order.

## B. The "Security Statement"

The Board adopted without discussion the ALJ's determination that Bishop's communications with the probationary employees about their obligation to pay Union fees violated § 8(a)(1) of the NLRA.[2] In the ALJ's view, Bishop's statements were designed "to convince the employees not to join the Union" and had the effect of encouraging them to sign the decertification petitions. He therefore found that the signatures of the five probationary employees were tainted, precluding reliance upon

them as objective evidence of the Union's loss of majority support.

█ We have minimal difficulty in upholding the finding that Bishop's *conduct* violated § 8(a)(1) by interfering with the operation of the union security clause. As the ALJ noted, "when the employees asked Bishop whether they had to pay initiation fees, the appropriate answer was 'Yes.' That is what the contract, still in effect, required." ALJ Opinion at 7. Bishop was aware of the contract requirement, and, indeed, had informed the employees when they were hired of the obligation to pay the fee. Although his decision to check with counsel in March may have reflected simply a naive hope that the decertification drive had weakened the enforceability of the contract, we cannot dismiss as unreasonable the ALJ's inference that Bishop was attempting to discourage Union support. In any event, no matter what the motivation, substantial evidence clearly supported the finding that Bishop interfered with enforcement of the security clause.

█ A closer call, however, is whether Bishop's conduct tainted the petition signatures of the five employees. Several factors weigh against a finding of taint. First, the employees initiated the contact with Bishop by asking whether they were required to pay the fees, demonstrating a pre-existing disaffection with the Union. Second, Bishop's comments about the fees requirement were largely factual and did not mislead the employees into thinking they could avoid the obligation by not joining the Union. He initially told them only to hold off paying until he found out the extent of their obligation, and later explicitly told them when and how they were required to pay. We see no impropriety in his telling them, *in response to their inquiry*, that the obligation would expire at the end of April, unless the contract were

---

**2.** Section 8(a)(1) provides: "It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7]...." 29 U.S.C. § 158(a)(1). Section 7 provides in pertinent part: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining...." *Id.* at § 157.

renewed. It was part of a complete answer to the question asked, particularly in the context of an ongoing decertification drive. *See Texaco, Inc. v. NLRB,* 722 F.2d 1226, 1231, 1234 (5th Cir.1984) (employer may furnish information upon request when employees ask about revoking dues checkoff or resigning from union); *Landmark International Trucks, Inc. v. NLRB,* 699 F.2d 815, 820–21 (6th Cir.1983) (in response to inquiry, employer lawfully sent letters to employees explaining how to resign from union). Even if this information influenced the employees' decisions to sign the petitions, their action resulted from their own investigation and not from Bishop's intervention.

Third, we see no basis for the inference of coercive impact apparently drawn by the ALJ from the timing of the five employees' signatures on the decertification petitions. *See* Opinion at 12. Three signed on March 19, after Bishop had read the first statement advising the employees to "sit tight" until the Company's legal counsel determined their obligations. The other two employees signed on March 20, the day Bishop explained their duty to pay fees. But it was on March 18 that the decertification proponents were given 72 hours to collect additional signatures. Thus, in light of the simultaneous effort to obtain more signatures on the decertification petitions, there is little basis for inferring that the five employees' signatures were coerced by Bishop's statements.

Despite these factors undercutting the ALJ's finding of taint, we feel constrained to uphold his conclusion based on one portion of the March 13 conversation. The opening of the prepared statement that Bishop read on that day linked, albeit loosely, the Company's practice of reducing post-probationary employee hours with the union security clause.[3] The ALJ concluded that an employee listening to this statement could have interpreted Bishop's message to be, "if there were no union, your hours would not be reduced." *See* ALJ Opinion at 8. Whether or not we would draw such an inference, we do not consider it unreasonable for the ALJ to have done so. *See NLRB v. Amber Delivery Service, Inc.,* 651 F.2d 57, 67 (1st Cir.1981) ("[E]ven a single oblique remark can be considered unduly coercive in appropriate circumstances."). The employees had not questioned the Company's practice of reducing hours, and there was no apparent connection between that practice and the fee obligation about which they did ask. We therefore must uphold the ALJ's finding that this statement was improper and may have influenced the employees' attitude toward the decertification drive, tainting their petition signatures.[4]

## C. Withdrawal of recognition based on "good faith doubt"

■ A union that is certified by the NLRB as the exclusive bargaining agent for a unit of employees enjoys an irrebuttable presumption of majority support for one year. *NLRB v. Curtin Matheson Scientific, Inc.,* —— U.S. ——, 110 S.Ct. 1542, 1544, 108 L.Ed.2d 801 (1990). The presumption continues after the first year, but becomes rebuttable. *Id.* 110 S.Ct. at 1545. To overcome this presumption, an employer

---

**3.** "When you were hired I advised you that this Union contract requires you to join and our practice has been to reduce your hours to 30 hours per week."

**4.** Our reading of the record suggests that, in drafting this statement, LaVerdiere's counsel actually may have been attempting to *avoid* directly criticizing the Union. According to Bishop's testimony, the lawyer told him in their first conversation that it not only might be improper for the Company to reduce hours when employees joined the Union but also that "it might be discriminatory for [the employees] to have to pay the initiation fee" because of their part-time status. The statement read to the employees, although somewhat ambiguous, *see supra* at p. 5, seems to address only *the Company's* possible impropriety—perhaps because it seemed inappropriate to challenge the Union directly during an ongoing decertification drive. Telling half the story, however, made Bishop's statement more susceptible to misinterpretation; if the only concern was the Company's possible improper discrimination based on union membership, there was no reason to advise the employees to hold off paying initiation fees.

We note this point not because it affects our decision with respect to taint, but because it reveals a possibly benign explanation for the Company's conduct. *See infra* at subsection D.

must show that, at the time of the refusal to bargain, either (1) the union in fact no longer enjoyed majority support, or (2) the employer had a reasonable "good faith" doubt, based on objective considerations, of the union's majority support. *Id.; Bolton–Emerson, Inc. v. NLRB,* 899 F.2d 104, 106 (1st Cir.1990).

■ The parties in this case have stipulated that the relevant bargaining unit contains 70 employees, and LaVerdiere's therefore must present support for its asserted belief that at least 35 members opposed the Union on May 27, 1985, the day the Company formally withdrew recognition. LaVerdiere's relies on a number of factors, the most significant of which are the employees' decertification petitions and the Anti-Union list compiled by the employees' attorney, the former containing 40 names and the latter 37. Our decision upholding the ALJ's finding of taint from the security statement, however, requires us to disregard the signatures of the five probationary employees. Similarly, we see no basis on which to disturb the Board's finding that the Company may not rely on the signatures of the two employees to whom Michael LaVerdiere described the petition as "just for a revote." Favoring a new representation election does not necessarily reflect union opposition, and those two employees were told that that was the only purpose of the petition drive.[5]

■ Making the appropriate reductions leaves 33 names on the petition and 31 on the attorney's list—neither of which is sufficient on its own to indicate a lack of majority support for Local 340. LaVerdiere's, however, argues that numerous other factors, taken together with the petitions and attorney list, combined to create an adequate objective basis for a good faith

doubt of majority support. *See Bolton–Emerson,* 899 F.2d at 106 (combination of factors may be basis for good faith doubt). The Company points to the following evidence:

—substantial turnover had occurred since the Union had been certified and the trend was that newer employees did not support the Teamsters;

—the Teamsters were adamantly resisting an election, suggesting that they doubted their strength;

—five employees told the Company directly that they did not want to pay their initiation fees;

—the Teamsters had informed the Company that twelve employees had not paid initiation fees;

—even discounting the presumedly tainted signatures, a substantial number of employees had signed the decertification petitions.

In addition, a factor of some significance emphasized by LaVerdiere's is that the NLRB regional director informed the Company that the Teamsters' withdrawal of recognition charge, filed in April, was being rejected because the Company had a sufficient basis for a good faith doubt of continued Union support. At that point, the Company argues, it could have committed an unfair labor practice had it *not* withdrawn recognition. *See International Ladies' Garment Workers' Union v. NLRB,* 366 U.S. 731, 732–33, 81 S.Ct. 1603, 1604–05, 6 L.Ed.2d 762 (1961) (recognizing union supported by minority of employees is an unfair labor practice).

We have sympathy for LaVerdiere's position. The record makes it clear that substantial employee opposition to the Union

---

**5.** Although the petitions stated on their face that the signatories no longer wished to be represented by the Teamsters, the Board held that Laverdiere's direct statement that the petitions were in fact "just for a revote" preempted the written language. In so holding, the Board analogized to its rule on counting authorization cards, which was approved by the Supreme Court in *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 606, 89 S.Ct. 1918, 1936, 23 L.Ed.2d 547 (1969). This rule provides that a card is invalid

if its "language is deliberately and clearly cancelled ... with words calculated to direct the signer to disregard and forget the language above his signature." The analogy is imprecise here because there is no evidence that LaVerdiere was aware of the language on the petition or "deliberately" sought to cancel it, but we nevertheless think it instructive in these circumstances because the clear message given to the employees was that the petition would be used *only* for a revote.

existed, and the Company's burden is to demonstrate only a *doubt,* not actual loss, of majority Union support. The employees initiated the decertification drive as well as both conversations that were deemed to taint petition signatures. Nevertheless, to rebut the presumption of continued majority support, the Company must come forward with objective evidence not only of substantial opposition to the Union but of *at least 50 percent* opposition. It failed to do so.

In fact, even had we not discounted the seven signatures found tainted by the Board, we in all likelihood still would have been required to uphold the finding of an improper withdrawal of recognition. The Regional Director's conclusion that LaVerdiere's *in April* had sufficient support for a good faith doubt of majority status does not necessarily guide the appropriate outcome for that issue at the end of May. In the interim, the Company received from the Union's business agent a counter-petition signed by 50 employees at a May 2 meeting. The petition affirmed the employees' desire for continued representation by Local 340 and demanded good-faith bargaining with the Union. Whatever the circumstances surrounding the signing of this petition,[6] it at least should have caused LaVerdiere's to move cautiously before withdrawing recognition. There is, however, no evidence of any effort undertaken by the Company to unravel the conflicting messages it had received from its employees in order to determine the extent of true opposition to the Union.

It may be that LaVerdiere's did not wish to investigate because the less it discovered to undercut the Regional Director's conclusion, the more appropriate it would seem to withdraw recognition. And frustrated by its inability to obtain an election, LaVerdiere's undoubtedly felt that the only chance for a speedy resolution of the matter would be for it to take such a step. While the desire to put the matter to rest is understandable, the Company took a risk when it withdrew recognition in the midst of mixed signals. In contrast, because of the contradictory petitions, we have no doubt that, had LaVerdiere's *not* withdrawn recognition at this point, it would not have faced a significant risk of an unfair labor charge based on recognition of a union that lacked majority support.

We therefore uphold the Board's finding that LaVerdiere's lacked an objectively based good faith doubt of majority union support when it withdrew recognition and that, in doing so, it violated § 8(a)(5) of the NLRA.[7]

## D. Election or Bargaining Order

■ It is a well-established principle that the Board's choice of remedy for a violation of the NLRA must be given "special respect." *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 1939 n. 32 (1969); *Amber Delivery Service,* 651 F.2d at 70.

Nevertheless, this court is a reviewing court and does not function simply as the Board's enforcement arm. It is our responsibility to examine carefully both the Board's findings and its reasoning, to assure that the Board has considered the factors which are relevant to its choice of remedy, selected a course which is remedial rather than punitive, and chosen a

---

**6.** An employee who signed the petition, in testimony credited by the ALJ, *see* Opinion at 9 n. 13, reported that the Union's business agent encouraged employees to sign by saying that the petition had no legal significance and would not be sent to the Board. According to her testimony, the Union agent spoke disparagingly of LaVerdiere's counsel (saying that he was a "crook" earning $400 an hour), and stated that if LaVerdiere's president saw that a majority of employees had signed the petition, he might back off and start bargaining. Tr. at 177. He further told the employees that if the conflict dragged on for a long period, it could lead to a strike, during which the employees could "draw unemployment and lay out in the sun all summer." *Id.* at 178. Finally, she testified that the Union agent told the employees they should continue to remain in good standing with the Union, but would not be in good standing if they failed to sign the petition.

**7.** This result automatically leads to the conclusion that the Board properly found that LaVerdiere's violated § 8(a)(5) by refusing a Union representative access to the Company's premises to investigate a grievance in November 1985.

remedy which can fairly be said to effectuate the purposes of the Act. *Peoples Gas System, Inc. v. NLRB*, 629 F.2d 35, 42 (D.C.Cir.1980).

Neither the ALJ nor the Board discussed the alternative of ordering an election in this case, and therefore did not articulate why they believed a bargaining order was the appropriate remedy. *See Peoples Gas*, 629 F.2d at 46 and n. 22 (discussing the Board's "perfunctory conclusions" to impose bargaining orders). Although we understand the logic of ordering the parties back to the positions in which they stood before the Company unlawfully withdrew recognition from the Union, we are unpersuaded that that remedy is, in these circumstances, the one "best suited to the purposes of the Act, which include both deterrence of employer misconduct and protection of employee free choice," *Peoples Gas*, 629 F.2d at 46 n. 18.

We reach this conclusion based on a number of specific factors, to which we now turn.

(1) *Employee Choice.* The most compelling factor in favor of an election is that this case arose in the context of an employee effort to bring about a decertification vote. Had Francis Richards and Marie Grandmaison been correctly informed about the size of the bargaining unit, it appears virtually beyond doubt that they would have gathered enough untainted signatures to trigger an election before the subsequent events blocking an election occurred. Unlike the employer's need to show a good faith doubt of *majority* support, the employees needed only a 30 percent showing of interest, or 21 employees. When they submitted their initial petition sheets to the Board, they were short only one name. The employees' later solicitation of additional signatures was to no avail, apparently because the Union by then had filed an unfair labor charge blocking an election. Thus, a Board-certified election would be most responsive to the wishes of the employees, whose free choice is a primary concern of the NLRA. *See, e.g., Texas Petrochemicals Corp. v. NLRB*, 923 F.2d 398, 406 (5th Cir.1991) (the NLRA

"was enacted not to further union membership or to deter it but to further employee choice and to provide an effective mechanism for realizing that choice").

(2) *Insubstantial nature of the violations.* This is not a case involving egregious anti-union conduct by the Company. As discussed above, LaVerdiere's did not instigate the decertification drive and its problematic conversations with employees could be said to have had only a minimal impact on their attitudes toward Local 340. *Cf. NLRB v. Horizon Air Services, Inc.*, 761 F.2d 22, 29 n. 5 (1st Cir.1985) (employer "manifested a Stalingrad defense of sorts to the threat of unionization, fighting the Union, by any means at hand, from rock to rock and from tree to tree"); *Eastern Maine Medical Center v. NLRB*, 658 F.2d 1, 3–13 (1st Cir.1981) (company failed to bargain in good faith, manipulated wage and benefit increases to discourage union support, questioned job applicants about union sentiments and improperly imposed solicitation restrictions); *Texaco, Inc. v. NLRB*, 722 F.2d 1226, 1228–29 (5th Cir. 1984) (management assisted in circulation of decertification petition and initiated idea to cancel collective bargaining agreement). Moreover, the history of LaVerdiere's relationship with the Union suggests a generally cooperative coexistence during the period in which the Union enjoyed substantial employee support. Accordingly, there appears to be no need to impose a bargaining order for the purpose of deterring the Company from efforts to undermine Local 340, or any other union chosen by its employees to represent them. *Cf. Horizon Air Services*, 761 F.2d at 32 (affirming bargaining order because the egregious actions of the employer "constitute a more than ample basis for a sound inference of future interference and/or enduring aftereffects"); *Eastern Maine Medical Center*, 658 F.2d at 13 (affirming bargaining order "in view of the serious and pervasive violations disclosed in the record").

(3) *Passage of time.* It has been roughly six years since LaVerdiere's withdrew recognition from Local 340, nearly three-and-one-half of which passed while the

ALJ's decision was on appeal to the Board. We share the view of other courts that inordinate delay attributable to the Board "cannot be ignored in developing a remedy that protects employee rights," *Texas Petrochemicals*, 923 F.2d at 404. *See also Peoples Gas*, 629 F.2d at 48; *J.J. Newberry Co. v. NLRB*, 645 F.2d 148, 154 (2d Cir. 1981). With the passage of time, the adverse effects of any improper conduct by the employer likely will be dissipated, particularly when that conduct amounted to insubstantial violations in the first place. In addition, significant turnover can be expected to occur when a case is pending for years; here, for example, only five of the 70 employees currently in the bargaining unit voted in a representation election.[8]

We recognize the other side of the argument—that taking into account the passage of time rewards employer recalcitrance, *see Peoples Gas*, 629 F.2d at 48—and do not mean to suggest that a lengthy delay should result automatically in an election rather than a bargaining order. *See Texas Petrochemicals*, 923 F.2d at 404 ("If delays are occasioned by an obstinate employer, he may not benefit from his own wrongs...."). But in circumstances such as these—where there existed a clear showing of substantial employee dissatisfaction unprovoked by the employer *before* the employer's less-than-egregious misconduct—we think the Board's inordinate delay strongly weighs against a bargaining order, which would impose a relationship on the parties for a substantial period into the future even in the face of strong employee opposition to the union.

Thus, each of these three factors weighs heavily in favor of an election. In arguing that the bargaining order should be upheld, the Union and Board focus in their briefs on the Union's presumption of continuing support, the principle that new hires also are presumed to support the union, and the Company's failure to show lack of majority support for the Union.[9] Conspicuously absent from their discussions, however, is any recognition that the conflict in this case arose from an employee-initiated drive to obtain a decertification election—a drive that generated substantial, if not proven majority, support. We think this factor is decisive in light of the other circumstances. We therefore conclude that the Board's choice of remedy clearly was unreasonable, constituting an abuse of its discretion, and that the bargaining order may not be enforced.[10]

## III. *Conclusion*

Limited in our review, we discern no reversible error in the Board's findings that LaVerdiere's committed several unfair labor practices in violation of the NLRA—with the security statement, the withdrawal of recognition and the refusal to permit union access to its facility. The equities presented in the record, however, cause us to conclude that the Board's choice of remedy may not be upheld. In these circumstances, we think the holding of a fair election—the "preferred" method for determining whether a union has majority sup-

---

8. Of the 70 members of the bargaining unit in the spring of 1985, 28 still remain.

9. At oral argument, the Union's counsel heavily emphasized the fact that 63 members of the unit remained on dues check-off in May, after the contract had expired and they had been told how to stop the procedure. The ALJ did not consider this information, *see* Opinion at 12 n. 16, and we are unable on the record before us to evaluate its significance. We therefore decline to give it weight.

10. We recognize that a bargaining order is more likely to be an appropriate remedy in withdrawal of recognition cases than in initial recognition cases because of the investment already made in the relationship. Moreover, the stabili-

ty of an ongoing relationship likely would be weakened if elections were too easily available, undercutting the basic purpose of the NLRA to promote industrial peace. *See NLRB v. Financial Institution Employees*, 475 U.S. 192, 208, 106 S.Ct. 1007, 1016, 89 L.Ed.2d 151 (1986); *Vaca v. Sipes*, 386 U.S. 171, 182, 87 S.Ct. 903, 912, 17 L.Ed.2d 842 (1967). Nevertheless, we think the Board must consider the election option seriously whenever "there is a substantial possibility that the employees do not want the Union and that a fair election can be held," *Peoples Gas*, 629 F.2d at 49. In this case, as discussed above, our view is that such consideration can lead only to the conclusion that a bargaining order is inappropriate.

port, *see Gissel,* 395 U.S. at 602, 89 S.Ct. at 1934—is the only appropriate option.

*Accordingly, the Board's order is enforced in part, denied in part and remanded to the Board for further action consistent with this opinion.*[11]

---

**11.** We do not, of course, direct that an election be held but simply refuse enforcement of the Board's bargaining order. Presumably on remand, the Board will wish to modify its remedy by requiring an election.